In the Matter of Joseph Burstyn, Inc., Petitioner, against Lewis A. Wilson, as Commissioner of Education of the State of New York, et al., Respondents.

Third Department, May 9, 1951.

254

*John C. Farber, Samuel E. Aronowitz, Earle R. Koons, Ephraim S. London* and *Clendon H. Lee* for petitioner.

*Charles A. Brind, Jr., John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* for respondents.

*Patrick C. Dugan, Charles J. Tobin, Edmund B. Butler, Porter R. Chandler* and *George A. Timone* for the New York State Catholic Welfare Committee, *amicus curiæ.*

*Osmond K. Fraenkel, Herbert Monte Levy, Robert Markewich* and *Newell G. Alford, Jr.,* for New York City Civil Liberties Committee and National Council on Freedom from Censorship, *amici curiæ.*

FOSTER, P. J. This is a proceeding under article 78 of the Civil Practice Act to review a determination of the Board of Regents of the University of the State of New York which rescinded licenses for the public exhibition of a motion picture film, entitled " The Miracle ", on the ground it is sacrilegious.

The picture, produced in Italy, depicts a demented peasant girl tending a herd of goats on a mountainside. A bearded stranger appears, garbed in a dress reminiscent of biblical times. She imagines him to be St. Joseph, and that he has come to take her to heaven. While she babbles about this he says nothing but plies her with wine, and the implication is left that he seduces her. Later, when her pregnancy becomes known to the villagers, they mock her and place a basin on her head in imitation of a halo. She exclaims at one point as to her pregnancy, " it's the grace of God ". She leaves the village to take refuge in a cave, and finally gives birth to a child in the basement of a church which stands on a high hill.

According to the English dialogue, in her babbling to the bearded stranger, she makes these statements: " I'm not well * * * and taking a loaf of bread he broke it . . . and an Angel of the Lord appeared to him in a dream and said . . . Joseph, son of David, have no fear to take Mary as your bride . . . for what is being conceived in here * * * St. Joseph * * * cast aside my body and take my soul . . . I would feel so happy without this weight * * * St. Joseph has come to visit me, what heaven, what heaven on earth . . . the mad woman has received a grace ".

On March 2, 1949, the motion picture division of the State Education Department issued a license for the picture with Italian dialogue. Apparently it was never shown pursuant to this license. On November 30, 1950, it was again licensed as a part of a triology entitled " Ways of Love ", with an English dialogue. After it had been publicly shown under this license the Board of Regents received many protests against its exhibition on the plaint that it was sacrilegious. A committee of the Regents was requested to view the picture, and

after it had reported there was a basis for the claim that the picture was sacrilegious the Commissioner of Education issued an order requiring the licensees of the film to show cause at a hearing before the same committee why the licenses should not be revoked.

At the hearing before the committee, petitioner, who was the holder of the license last issued, appeared specially and challenged the Regents' authority to proceed in the matter on the theory that it had no power of review under the statute as to a license once issued. The committee reported that in its opinion the Regents had authority to consider whether the film was licensed illegally or not, and recommended that the Board of Regents, as a committee of the whole, view the picture. This action was taken, and after due consideration the board found the picture to be sacrilegious, and voted to rescind the licenses therefor on February 16, 1951.

Overshadowing all other arguments petitioner contends on this review that censorship of sound motion pictures is unconstitutional as a previous restraint on freedom of speech and freedom of the press, in violation of the 1st and 14th Amendments to the Constitution of the United States and section 8 of article I of the Constitution of the State of New York. We do not regard such an issue as an open one in this court. Motion pictures have been judicially declared to be entertainment spectacles, and not a part of the press or organs of public opinion; and hence subject to State censorship (*Mutual Film Corp.* v. *Ohio Industrial Comm.*, 236 U. S. 230). This court has upheld the power of the State to censor motion pictures (*Pathe Exchange, Inc.*, v. *Cobb*, 202 App. Div. 450), a decision which was affirmed by the Court of Appeals (236 N. Y. 539). Strong criticism has been voiced against the distinctions made between movie films and freedom of expression otherwise guaranteed (36 Corn. L. Q., 273); and some dicta would seem to indicate a change of viewpoint (*United States* v. *Paramount Pictures*, 334 U. S. 136, 166). But despite the enlarged scope of motion pictures as a medium of expression in recent years, and the addition of sound dialogue, the latest authoritative judicial expression which bears directly on the subject still recognizes the distinction (*Rd-Dr Corp.* v. *Smith*, 183 F. 2d 562, certiorari denied 340 U. S. 853). In view of this situation it is not appropriate for us, as an intermediate court, to re-examine the issue.

In addition to arguing against the principle of censorship generally, petitioner also argues that section 122 of the Education Law, which bars the licensing of a motion picture deemed

sacrilegious, is an unconstitutional exercise of legislative power. This argument proceeds on the theory that nothing can be deemed sacrilegious as applied to a motion picture without impinging on the constitutional guaranty of freedom of religion. Petitioner cites the fact that what may be sacrilegious to one group of citizens may not be so as to other groups; and hence it reasons that no enforcible meaning can be given to the term for the purposes of censorship. The Board of Regents based its revocation solely on the ground that the picture is sacrilegious; that it parodies in effect the Immaculate Conception and the Divine birth of Christ as set forth in the New Testament. By millions of Christians these doctrines are held sacred, and any profanation thereof regarded as a sacrilege. Concededly there are other groups who do not accept these beliefs. May the State bar on the ground of sacrilege a motion picture that profanes the religious beliefs of one group, however large, when the profanation is not common and universal to all groups? Assuming the validity of the distinction we have already noted between motion pictures and other organs of expression we think the answer to this question lies in the affirmative.

The term "sacrilege", according to modern semantics, means the violation or profanation of sacred things. It is derived from the Latin word "sacrilegium", which originally meant merely the theft of sacred things, but its meaning has since been widely extended. Even as far back as Cicero's time it had grown in popular speech to include any insult or injury to things deemed sacred (19 Encyclopædia Britannica 803). Obviously the Legislature used the term in its widest sense, and we think it was intended to apply to all recognized religions, not merely to one sect alone. Any construction which denoted a preference for one sect would be inconsistent with the constitutional mandate of complete separation between church and State. Support, for this view may be found in another field. For instance, it is a criminal offense in this State to present an exhibition in which there shall be a living character representing the deity of any known religion (Penal Law, § 2074). In a sense this statute also impinges on freedom of expression so far as religion is concerned, yet no one, that we can discover, has challenged the power of the State in the interests of public peace and order to enforce it. We think the State has the same power for the same reason to exercise a previous restraint as to motion pictures that may fairly be deemed sacrilegious to the adherents of any religious group. The exercise of such a power is directly related to public peace and order, and unless

clearly in conflict with a constitutional prohibition it should not be denied.

We fail to see how such restraint can be construed as denying freedom of religion to anyone, or how it raises the dogma of any one group to a legal imperative above other groups. As we construe the statute all faiths are entitled to the same protection against sacrilege. This is not to say that full inquiry and free discussion, even to the point of attack, may not be had with regard to the doctrines of any religion, including Christianity, by those who are freethinkers and otherwise (*Commonwealth* v. *Kneeland,* 37 Mass. 206; *Cantwell* v. *Connecticut,* 310 U. S. 296). However motion pictures, staged for entertainment purposes alone, are not within the category of inquiry and discussion. A view of the picture in question would convince any reasonable mind that it was conceived and produced purely as an entertainment spectacle, and not as a vehicle for inquiry or discussion as to the merits of any religious dogma. The statute does not muzzle either free speech or a free press. All it purports to do is to bar a visual caricature of religious beliefs held sacred by one sect or another, and such a bar, in our opinion, is not a denial of religious freedom. It should be added in connection with this point that news films, scientific and educational films, are expressly exempted from censorship. (Education Law, § 123.)

Aside from all this petitioner contends that the Board of Regents was without power to rescind a license granted by the motion picture division, because the statute does not expressly provide for a review by the Regents where a license has once been issued. It does provide for a review in the case where a license is denied (Education Law, § 124). The Regents take the view that in rescinding the licenses they were merely correcting the illegal acts of a subordinate body, and that as the head of the Department of Education and charged with the enforcement of censorship provisions of the statute they had the power to do so.

The motion picture division of the Department of Education is successor to the Motion Picture Commission, an independent body established in 1921 when the State first undertook the censorship of motion pictures. The latter was abolished in 1926 and its functions transferred to the Education Department (L. 1926, ch. 544). In 1927 the law was again revised and provided for the continuation of a motion picture division within the Education Department in language now contained in section 120 of the present Education Law. This section provides in

part: " There shall continue to be in the education department a motion picture division. The head of such division shall be a director, who shall be appointed by the regents, upon the recommendation of the commissioner of education. The regents may consolidate such division with the division of visual instruction or may assign to the motion picture division the functions, powers and duties of other divisions, bureaus or officers in the department. The board of regents, upon the recommendation of the commissioner of education, shall appoint such officers and employees as may be needed and prescribe the powers and duties and, within the limits of the appropriations made therefor, fix the compensation of such director, officers and employees. * * * ''

Section 121 of the same statute authorizes the Regents to establish offices and bureaus for the reception and examination of films.

Section 122 provides for censorship in these words: " The director of the division or, when authorized by the regents, the officers of a local office or bureau shall cause to be promptly examined every motion picture film submitted to them as herein required, and unless such film or a part thereof is obscene, indecent, immoral, inhuman, *sacrilegious,* or is of such a character that its exhibition would tend to corrupt morals or incite to crime, shall issue a license therefor. * * * '' (Emphasis supplied.)

Section 124 authorizes a review by the Regents, or a committee thereof, at the behest of an applicant in case a license is denied by the motion picture division.

Section 132, however, empowers the Board of Regents in the broadest of language to enforce the provisions and purposes of the entire article relating to the motion picture division.

These brief references to the statute clearly indicate that the motion picture division is a subordinate body of the Education Department under the control of the Board of Regents. We think it equally clear that the latter has the power to correct or rescind any illegal action taken by its motion picture division. If this is not so then the language of section 132 of the statute must be held meaningless, for one of the provisions and purposes of the statute is to prevent the licensing of a motion picture that is immoral or sacrilegious. If the motion picture division was an independent body, then undoubtedly the maxim cited by petitioner, " Expressio unius est exclusio alterius '', would apply; the grant of an express power to review in one case would negative a power by implication to review in a case

not specified. The subordinate position of the motion picture division and the supreme responsibility of the Regents to enforce the provisions and purposes of the statute preclude the application of the maxim here.

We may add that it seems most unlikely from a practical viewpoint that the Legislature intended to leave the authorities helpless in a case where through some misconception or inadvertence on the part of the motion picture division a film was illegally licensed. Such would be the result, for instance, where an immoral picture happened to slip by the motion picture division through inadvertence or otherwise. In such a case it would have to be held, if petitioner is right, that the Regents could not correct the situation; and on the other hand, a criminal prosecution would be impossible because the film has been licensed (Penal Law, § 1141). Such a stalemate would be repugnant to common sense, and every implication is against it. It furnishes ground for the belief that the Legislature gave no specific grant of power to the Regents for a review when a license was granted because none was considered necessary; the power to correct was inherent in the statute.

There remains the issue as to whether the Regents acted arbitrarily and capriciously in the matter. Once the validity of the principle of censorship is admitted the issue in each case becomes one of judgment; in fact, that is one of the gravest arguments against the principle. The record before us indicates varying views as to whether the picture in question is so offensive to large groups within the Christian sect as to justify a finding that as to them it is sacrilegious. This conflict of views is proof that the issue is one of judgment to be resolved by the administrative body which has it in charge. The text and content of the picture itself, together with the complaints received, constituted substantial evidence upon which the Regents could act. Under the familiar rule, applicable to all administrative proceedings, we may not interfere unless the determination made was one that no reasonable mind could reach. While some of us feel that the importance of the picture has been exaggerated we can not justly say that the determination complained of was one that no reasonable mind would countenance.

The determination therefore should be confirmed, with $50 costs and disbursements.

HEFFERNAN, BREWSTER, DEYO and BERGAN, JJ., concur.

Determination confirmed, with $50 costs and disbursements.