JOSEPH BURSTYN, INC. *v.* WILSON, COMMIS-
SIONER OF EDUCATION OF NEW YORK, ET AL.

No. 522. Argued April 24, 1952.—Decided May 26, 1952.

*Ephraim S. London* argued the cause and filed a brief for appellant.

*Charles A. Brind, Jr.* and *Wendell P. Brown,* Solicitor General of New York, argued the cause for appellees. With them on the brief were *Nathaniel L. Goldstein,* Attorney General of New York, and *Ruth Kessler Toch,* Assistant Attorney General.

*Morris L. Ernst, Osmond K. Fraenkel, Arthur Garfield Hays, Herbert Monte Levy, Emanuel Redfield, Shad Polier, Will Maslow, Leo Pfeffer, Herman Seid* and *Eberhard P. Deutsch* filed a brief for the American Civil Liberties Union et al., as *amici curiae,* urging reversal.

*Charles J. Tobin, Edmond B. Butler* and *Porter R. Chandler* filed a brief for the New York State Catholic Welfare Committee, as *amicus curiae,* urging affirmance.

MR. JUSTICE CLARK delivered the opinion of the Court.

The issue here is the constitutionality, under the First and Fourteenth Amendments, of a New York statute which permits the banning of motion picture films on the ground that they are "sacrilegious." That statute makes it unlawful "to exhibit, or to sell, lease or lend for exhibition at any place of amusement for pay or in connection with any business in the state of New York, any motion picture film or reel [with specified exceptions not relevant here], unless there is at the time in full force and effect a valid license or permit therefor of the education department . . . ."[1] The statute further provides:

> "The director of the [motion picture] division [of the education department] or, when authorized by the regents, the officers of a local office or bureau shall cause to be promptly examined every motion picture film submitted to them as herein required, and unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime, shall issue a license therefor. If such director or, when so authorized, such officer shall not license any film submitted, he shall furnish to the applicant therefor a written report of the reasons for his refusal and a description of each rejected part of a film not rejected in toto."[2]

Appellant is a corporation engaged in the business of distributing motion pictures. It owns the exclusive rights to distribute throughout the United States a film produced in Italy entitled "The Miracle." On November 30, 1950, after having examined the picture, the motion picture division of the New York education depart-

---

[1] McKinney's N. Y. Laws, 1947, Education Law, § 129.

[2] *Id.*, § 122.

ment, acting under the statute quoted above, issued to appellant a license authorizing exhibition of "The Miracle," with English subtitles, as one part of a trilogy called "Ways of Love." [3] Thereafter, for a period of approximately eight weeks, "Ways of Love" was exhibited publicly in a motion picture theater in New York City under an agreement between appellant and the owner of the theater whereby appellant received a stated percentage of the admission price.

During this period, the New York State Board of Regents, which by statute is made the head of the education department,[4] received "hundreds of letters, telegrams, post cards, affidavits and other communications" both protesting against and defending the public exhibition of "The Miracle." [5] The Chancellor of the Board of Regents requested three members of the Board to view the picture and to make a report to the entire Board. After viewing the film, this committee reported to the Board that in its opinion there was basis for the claim that the picture was "sacrilegious." Thereafter, on January 19, 1951, the Regents directed appellant to show cause, at a hearing to be held on January 30, why its license to show "The Miracle" should not be rescinded on that ground. Appellant appeared at this hearing, which was conducted by the same three-member committee of the Regents which had previously viewed the picture, and challenged the jurisdiction of the committee and of the Regents to proceed with the case. With the consent of the committee, various interested persons and

---

[3] The motion picture division had previously issued a license for exhibition of "The Miracle" without English subtitles, but the film was never shown under that license.

[4] McKinney's N. Y. Laws, 1947, Education Law, § 101; see also N. Y. Const., Art. V, § 4.

[5] Stipulation between appellant and appellee, R. 86.

organizations submitted to it briefs and exhibits bearing upon the merits of the picture and upon the constitutional and statutory questions involved. On February 16, 1951, the Regents, after viewing "The Miracle," determined that it was "sacrilegious" and for that reason ordered the Commissioner of Education to rescind appellant's license to exhibit the picture. The Commissioner did so.

Appellant brought the present action in the New York courts to review the determination of the Regents.[6] Among the claims advanced by appellant were (1) that the statute violates the Fourteenth Amendment as a prior restraint upon freedom of speech and of the press; (2) that it is invalid under the same Amendment as a violation of the guaranty of separate church and state and as a prohibition of the free exercise of religion; and, (3) that the term "sacrilegious" is so vague and indefinite as to offend due process. The Appellate Division rejected all of appellant's contentions and upheld the Regents' determination. 278 App. Div. 253, 104 N. Y. S. 2d 740. On appeal the New York Court of Appeals, two judges dissenting, affirmed the order of the Appellate Division. 303 N. Y. 242, 101 N. E. 2d 665. The case is here on appeal. 28 U. S. C. § 1257 (2).

As we view the case, we need consider only appellant's contention that the New York statute is an unconstitutional abridgment of free speech and a free press. In *Mutual Film Corp.* v. *Industrial Comm'n*, 236 U. S. 230 (1915), a distributor of motion pictures sought to enjoin the enforcement of an Ohio statute which required the prior approval of a board of censors before any motion

---

[6] The action was brought under Article 78 of the New York Civil Practice Act, Gilbert-Bliss N. Y. Civ. Prac., Vol. 6B, 1944, 1949 Supp., § 1283 *et seq.* See also McKinney's N. Y. Laws, 1947, Education Law, § 124.

picture could be publicly exhibited in the state, and which directed the board to approve only such films as it adjudged to be "of a moral, educational or amusing and harmless character." The statute was assailed in part as an unconstitutional abridgment of the freedom of the press guaranteed by the First and Fourteenth Amendments. The District Court rejected this contention, stating that the first eight Amendments were not a restriction on state action. 215 F. 138, 141 (D. C. N. D. Ohio 1914). On appeal to this Court, plaintiff in its brief abandoned this claim and contended merely that the statute in question violated the freedom of speech and publication guaranteed by the Constitution of Ohio. In affirming the decree of the District Court denying injunctive relief, this Court stated:

> "It cannot be put out of view that the exhibition of moving pictures is a business pure and simple, originated and conducted for profit, like other spectacles, not to be regarded, nor intended to be regarded by the Ohio constitution, we think, as part of the press of the country or as organs of public opinion." [7]

In a series of decisions beginning with *Gitlow* v. *New York,* 268 U. S. 652 (1925), this Court held that the liberty of speech and of the press which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action.[8] That principle has been

---

[7] 236 U. S., at 244.

[8] *Gitlow* v. *New York,* 268 U. S. 652, 666 (1925); *Stromberg* v. *California,* 283 U. S. 359, 368 (1931); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 707 (1931); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 (1936); *De Jonge* v. *Oregon,* 299 U. S. 353, 364 (1937); *Lovell* v. *Griffin,* 303 U. S. 444, 450 (1938); *Schneider* v. *State,* 308 U. S. 147, 160 (1939).

followed and reaffirmed to the present day. Since this series of decisions came after the *Mutual* decision, the present case is the first to present squarely to us the question whether motion pictures are within the ambit of protection which the First Amendment, through the Fourteenth, secures to any form of "speech" or "the press." [9]

It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression.[10] The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform. As was said in *Winters* v. *New York,* 333 U. S. 507, 510 (1948):

> "The line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine."

It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree. That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amend-

---

[9] See *Lovell* v. *Griffin,* 303 U. S. 444, 452 (1938).

[10] See Inglis, Freedom of the Movies (1947), 20–24; Klapper, The Effects of Mass Media (1950), *passim;* Note, Motion Pictures and the First Amendment, 60 Yale L. J. 696, 704–708 (1951), and sources cited therein.

502

ment.[11]   We fail to see why operation for profit should
have any different effect in the case of motion pictures.

It is further urged that motion pictures possess a greater
capacity for evil, particularly among the youth of a com-
munity, than other modes of expression.   Even if one
were to accept this hypothesis, it does not follow that
motion pictures should be disqualified from First Amend-
ment protection.   If there be capacity for evil it may
be relevant in determining the permissible scope of com-
munity control, but it does not authorize substantially
unbridled censorship such as we have here.

For the foregoing reasons, we conclude that expression
by means of motion pictures is included within the free
speech and free press guaranty of the First and Four-
teenth Amendments.   To the extent that language in
the opinion in *Mutual Film Corp.* v. *Industrial Comm'n,
supra,* is out of harmony with the views here set forth,
we no longer adhere to it.[12]

To hold that liberty of expression by means of motion
pictures is guaranteed by the First and Fourteenth
Amendments, however, is not the end of our problem.
It does not follow that the Constitution requires absolute
freedom to exhibit every motion picture of every kind at
all times and all places.   That much is evident from the
series of decisions of this Court with respect to other

---

[11] See *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936);
*Thomas* v. *Collins,* 323 U. S. 516, 531 (1945).

[12] See *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131,
166 (1948): "We have no doubt that moving pictures, like newspa-
pers and radio, are included in the press whose freedom is guaranteed
by the First Amendment."   It is not without significance that talk-
ing pictures were first produced in 1926, eleven years after the
*Mutual* decision.   Hampton, A History of the Movies (1931), 382–
383.

media of communication of ideas.[13]  Nor does it follow
that motion pictures are necessarily subject to the precise
rules governing any other particular method of expres-
sion.  Each method tends to present its own peculiar
problems.  But the basic principles of freedom of speech
and the press, like the First Amendment's command, do
not vary.  Those principles, as they have frequently
been enunciated by this Court, make freedom of expres-
sion the rule.  There is no justification in this case for
making an exception to that rule.

The statute involved here does not seek to punish, as
a past offense, speech or writing falling within the per-
missible scope of subsequent punishment.  On the con-
trary, New York requires that permission to communicate
ideas be obtained in advance from state officials who
judge the content of the words and pictures sought to
be communicated.  This Court recognized many years
ago that such a previous restraint is a form of infringe-
ment upon freedom of expression to be especially con-
demned.  *Near* v. *Minnesota ex rel. Olson,* 283 U. S.
697 (1931).  The Court there recounted the history
which indicates that a major purpose of the First Amend-
ment guaranty of a free press was to prevent prior re-
straints upon publication, although it was carefully
pointed out that the liberty of the press is not limited
to that protection.[14]  It was further stated that "the pro-
tection even as to previous restraint is not absolutely
unlimited.  But the limitation has been recognized only

---

[13] *E. g., Feiner* v. *New York,* 340 U. S. 315 (1951); *Kovacs* v.
*Cooper,* 336 U. S. 77 (1949); *Chaplinsky* v. *New Hampshire,* 315
U. S. 568 (1942); *Cox* v. *New Hampshire,* 312 U. S. 569 (1941).

[14] *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 713–719 (1931);
see also *Lovell* v. *Griffin,* 303 U. S. 444, 451–452 (1938); *Grosjean* v.
*American Press Co.,* 297 U. S. 233, 245–250 (1936); *Patterson* v.
*Colorado,* 205 U. S. 454, 462 (1907).

in exceptional cases." *Id.*, at 716. In the light of the First Amendment's history and of the *Near* decision, the State has a heavy burden to demonstrate that the limitation challenged here presents such an exceptional case.

New York's highest court says there is "nothing mysterious" about the statutory provision applied in this case: "It is simply this: that no religion, as that word is understood by the ordinary, reasonable person, shall be treated with contempt, mockery, scorn and ridicule . . . ." [15] This is far from the kind of narrow exception to freedom of expression which a state may carve out to satisfy the adverse demands of other interests of society.[16] In seeking to apply the broad and all-inclusive definition of "sacrilegious" given by the New York courts, the censor is set adrift upon a boundless sea amid a myriad of conflicting currents of religious views, with no

---

[15] 303 N. Y. 242, 258, 101 N. E. 2d 665, 672. At another point the Court of Appeals gave "sacrilegious" the following definition: "the act of violating or profaning anything sacred." *Id.*, at 255, 101 N. E. 2d at 670. The Court of Appeals also approved the Appellate Division's interpretation: "As the court below said of the statute in question, 'All it purports to do is to bar a visual caricature of religious beliefs held sacred by one sect or another . . . .'" *Id.*, at 258, 101 N. E. 2d at 672. Judge Fuld, dissenting, concluded from all the statements in the majority opinion that "the basic criterion appears to be whether the film treats a religious theme in such a manner as to offend the religious beliefs of any group of persons. If the film does have that effect, and it is 'offered as a form of entertainment,' it apparently falls within the statutory ban regardless of the sincerity and good faith of the producer of the film, no matter how temperate the treatment of the theme, and no matter how unlikely a public disturbance or breach of the peace. The drastic nature of such a ban is highlighted by the fact that the film in question makes no direct attack on, or criticism of, any religious dogma or principle, and it is not claimed to be obscene, scurrilous, intemperate or abusive." *Id.*, at 271–272, 101 N. E. 2d at 680.

[16] Cf. *Thornhill* v. *Alabama*, 310 U. S. 88, 97 (1940); *Stromberg* v. *California*, 283 U. S. 359, 369–370 (1931).

charts but those provided by the most vocal and power-
ful orthodoxies. New York cannot vest such unlimited
restraining control over motion pictures in a censor. Cf.
*Kunz* v. *New York,* 340 U. S. 290 (1951).[17] Under such
a standard the most careful and tolerant censor would
find it virtually impossible to avoid favoring one religion
over another, and he would be subject to an inevitable
tendency to ban the expression of unpopular sentiments
sacred to a religious minority. Application of the "sac-
rilegious" test, in these or other respects, might raise sub-
stantial questions under the First Amendment's guaranty
of separate church and state with freedom of worship for
all.[18] However, from the standpoint of freedom of speech
and the press, it is enough to point out that the state has
no legitimate interest in protecting any or all religions
from views distasteful to them which is sufficient to jus-
tify prior restraints upon the expression of those views.
It is not the business of government in our nation to sup-
press real or imagined attacks upon a particular religious
doctrine, whether they appear in publications, speeches,
or motion pictures.[19]

Since the term "sacrilegious" is the sole standard under
attack here, it is not necessary for us to decide, for ex-

[17] Cf. *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *Saia* v. *New
York,* 334 U. S. 558 (1948); *Largent* v. *Texas,* 318 U. S. 418 (1943);
*Lovell* v. *Griffin,* 303 U. S. 444 (1938).

[18] See *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940).

[19] See the following statement by Mr. Justice Roberts, speaking for
a unanimous Court in *Cantwell* v. *Connecticut,* 310 U. S. 296, 310
(1940):

"In the realm of religious faith, and in that of political belief,
sharp differences arise. In both fields the tenets of one man may
seem the rankest error to his neighbor. To persuade others to his
own point of view, the pleader, as we know, at times, resorts to
exaggeration, to vilification of men who have been, or are, prominent
in church or state, and even to false statement. But the people of

ample, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us.[20] We hold only that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is "sacrilegious."

*Reversed.*

MR. JUSTICE REED, concurring in the judgment of the Court.

Assuming that a state may establish a system for the licensing of motion pictures, an issue not foreclosed by the Court's opinion, our duty requires us to examine the facts of the refusal of a license in each case to determine

this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

"The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed. Nowhere is this shield more necessary than in our own country for a people composed of many races and of many creeds."

[20] In the *Near* case, this Court stated that "the primary requirements of decency may be enforced against obscene publications." 283 U. S. 697, 716. In *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942), Mr. Justice Murphy stated for a unanimous Court: "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." But see *Kovacs* v. *Cooper*, 336 U. S. 77, 82 (1949): "When ordinances undertake censorship of speech or religious practices before permitting their exercise, the Constitution forbids their enforcement."

whether the principles of the First Amendment have been honored. This film does not seem to me to be of a character that the First Amendment permits a state to exclude from public view.

Mr. Justice Frankfurter, whom Mr. Justice Jackson joins, concurring in the judgment of the Court; Mr. Justice Burton, having concurred in the opinion of the Court, also joins this opinion.

A practised hand has thus summarized the story of "The Miracle": [1]

> "A poor, simple-minded girl is tending a herd of goats on a mountainside one day, when a bearded stranger passes. Suddenly it strikes her fancy that he is St. Joseph, her favorite saint, and that he has come to take her to heaven, where she will be happy and free. While she pleads with him to transport her, the stranger gently plies the girl with wine, and when she is in a state of tumult, he apparently ravishes her. (This incident in the story is only briefly and discreetly implied.)
>
> "The girl awakens later, finds the stranger gone, and climbs down from the mountain not knowing whether he was real or a dream. She meets an old priest who tells her that it is quite possible that she did see a saint, but a younger priest scoffs at the notion. 'Materialist!' the old priest says.
>
> "There follows now a brief sequence—intended to be symbolic, obviously—in which the girl is reverently sitting with other villagers in church. Moved by a whim of appetite, she snitches an apple from the basket of a woman next to her. . When she leaves the church, a cackling beggar tries to make her share

---

[1] Crowther, "The Strange Case of 'The Miracle,'" Atlantic Monthly, April, 1951, pp. 35, 36–37.

the apple with him, but she chases him away as by habit and munches the fruit contentedly.

"Then, one day, while tending the village youngsters as their mothers work at the vines, the girl faints and the women discover that she is going to have a child. Frightened and bewildered, she suddenly murmurs, 'It is the grace of God!' and she runs to the church in great excitement, looks for the statue of St. Joseph, and then prostrates herself on the floor.

"Thereafter she meekly refuses to do any menial work and the housewives humor her gently but the young people are not so kind. In a scene of brutal torment, they first flatter' and laughingly mock her, then they cruelly shove and hit her and clamp a basin as a halo on her head. Even abused by the beggars, the poor girl gathers together her pitiful rags and sadly departs from the village to live alone in a cave.

"When she feels her time coming upon her, she starts back towards the village. But then she sees the crowds in the streets; dark memories haunt her; so she turns towards a church on a high hill and instinctively struggles towards it, crying desperately to God. A goat is her sole companion. She drinks water dripping from a rock. And when she comes to the church and finds the door locked, the goat attracts her to a small side door. Inside the church, the poor girl braces herself for her labor pains. There is a dissolve, and when we next see her sad face, in close-up, it is full of a tender light. There is the cry of an unseen baby. The girl reaches towards it and murmurs, 'My son! My love! My flesh!' "

"The Miracle"— a film lasting forty minutes—was produced in Italy by Roberto Rossellini. Anna Magnani played the lead as the demented goat-tender. It was first shown at the Venice Film Festival in August, 1948,

combined with another moving picture, "L'Umano Voce," into a diptych called "Amore." According to an affidavit from the Director of that Festival, if the motion picture had been "blasphemous" it would have been barred by the Festival Committee. In a review of the film in L'Osservatore Romano, the organ of the Vatican, its film critic, Piero Regnoli, wrote: "Opinions may vary and questions may arise—even serious ones—of a religious nature (not to be diminished by the fact that the woman portrayed is mad [because] the author who attributed madness to her is not mad) . . . ."[2] While acknowledging that there were "passages of undoubted cinematic distinction," Regnoli criticized the film as being "on such a pretentiously cerebral plane that it reminds one of the early d'Annunzio." The Vatican newspaper's critic concluded: "we continue to believe in Rossellini's art and we look forward to his next achievement."[3] In October, 1948, a month after the Rome premiere of "The Miracle," the Vatican's censorship agency, the Catholic Cinematographic Centre, declared that the picture "constitutes in effect an abominable profanation from religious and moral viewpoints."[4] By the Lateran agreements and the Italian Constitution the Italian Government is bound to bar whatever may offend the Catholic religion. However, the Catholic Cinematographic Centre did not invoke any governmental sanction thereby afforded. The Italian Government's censorship agency gave "The Miracle" the regular *nulla osta* clearance. The film was freely shown throughout Italy, but was not a great success.[5] Italian movie critics divided in opinion. The critic for Il Popolo, speaking for the Christian Democratic Party, the Catholic

---

[2] L'Osservatore Romano, Aug. 25, 1948, p. 2, col. 1, translated in part in The Commonweal, Mar. 23, 1951, p. 592, col. 2.

[3] *Ibid.*

[4] N. Y. Times, Feb. 11, 1951, § 2, p. 4, cols. 4–5.

[5] Time, Feb. 19, 1951, pp. 60–61.

party, profusely praised the picture as a "beautiful thing,
humanly felt, alive, true and without religious profanation
as someone has said, because in our opinion the meaning
of the characters is clear and there is no possibility of
misunderstanding." [6]   Regnoli again reviewed "The Mir-
acle" for L'Osservatore Romano.[7]   After criticising the
film for technical faults, he found "the most courageous
and interesting passage of Rossellini's work" in contrast-
ing portrayals in the film; he added: "Unfortunately, con-
cerning morals, it is necessary to note some slight defects."
He objected to its "carnality" and to the representation
of illegitimate motherhood.   But he did not suggest that
the picture was "sacrilegious."   The tone of Regnoli's
critique was one of respect for Rossellini, "the illustrious
Italian producer." [8]

On March 2, 1949, "The Miracle" was licensed in New
York State for showing without English subtitles.[9]   How-
ever, it was never exhibited until after a second license
was issued on November 30, 1950, for the trilogy, "Ways
of Love," combining "The Miracle" with two French
films, Jean Renoir's "A Day in the Country" and Marcel
Pagnol's "Jofroi." [10]   All had English subtitles.   Both li-

---

[6] Il Popolo, Nov. 3, 1948, p. 2, col. 9, translated by Camille M.
Cianfarra, N. Y. Times, Feb. 11, 1951, § 2, p. 4, col. 5.

[7] L'Osservatore Romano, Nov. 12, 1948, p. 2, cols. 3-4.

[8] *Ibid.*

[9] "The Miracle" was passed by customs.   To import "any obscene,
lewd, lascivious, or filthy . . . motion-picture film" is a criminal
offense, 35 Stat. 1088, 1138, 18 U. S. C. (Supp. IV) § 1462; and
importation of any obscene "print" or "picture" is barred.   46 Stat.
590, 688, 19 U. S. C. § 1305.   Compare the provision, "all photo-
graphic-films imported . . . shall be subject to such censorship as
may be imposed by the Secretary of the Treasury."   38 Stat. 114,
151 (1913), 42 Stat. 858, 920 (1922), repealed 46 Stat. 590, 762
(1930).   See Inglis, Freedom of the Movies, 68.

[10] Life, Jan. 15, 1951, p. 63; Sat. Rev. of Lit., Jan. 27, 1951, pp.
28-29.

censes were issued in the usual course after viewings of the picture by the Motion Picture Division of the New York State Education Department. The Division is directed by statute to "issue a license" "unless [the] film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime." N. Y. Education Law, § 122. The trilogy opened on December 12, 1950, at the Paris Theatre on 58th Street in Manhattan. It was promptly attacked as "a sacrilegious and blasphemous mockery of Christian religious truth" [11] by the National Legion of Decency, a private Catholic organization for film censorship, whose objectives have intermittently been approved by various non-Catholic church and social groups since its formation in 1933.[12] However, the National Board of Review (a non-industry lay organization devoted to raising the level of motion pictures by mobilizing public opinion, under the slogan "Selection Not Censorship")[13] recommended the picture as "especially worth seeing." New York critics on the whole praised "The Miracle"; those who dispraised did not suggest sacrilege.[14] On December 27 the critics selected the "Ways of Love" as the best foreign language

---

[11] N. Y. Times, Dec. 31, 1950, p. 23, col. 4.

[12] Inglis, Freedom of the Movies, 120 *et seq*.

[13] *Id.*, at 74–82.

[14] Howard Barnes, N. Y. Herald Tribune, Dec. 13, 1950, p. 30, cols. 1–3: "it would be wise to time a visit to the Paris in order to skip ['The Miracle']. . . . Altogether it leaves a very bad taste in one's mouth."

Bosley Crowther, N. Y. Times, Dec. 13, 1950, p. 50, cols. 2–3: "each one of the [three] items . . . stacks up with the major achievements of the respective directors . . . . ['The Miracle'] is by far the most overpowering and provocative of the lot." N. Y. Times, Dec. 17, 1950, § 2, p. 3, cols. 7–8: "a picture of mounting intensity that wrings the last pang of emotion as it hits its dramatic

film in 1950.[15]   Meanwhile, on December 23, Edward
T. McCaffrey, Commissioner of Licenses for New York
City, declared the film "officially and personally blasphe-
mous" and ordered it withdrawn at the risk of suspension
of the license to operate the Paris Theatre.[16]   A week
later the program was restored at the theatre upon the
decision by the New York Supreme Court that the City

peak . . . vastly compassionate comprehension of the suffering and
the triumph of birth."

Wanda Hale, N. Y. Daily News, Dec. 13, 1950, p. 82, cols. 1–3:
"Rossellini's best piece of direction, since his greatest, 'Open City.'
. . . artistic and beautifully done by both the star and the director."

Archer Winsten, N. Y. Post, Dec. 13, 1950, p. 80, cols. 1–3:
"Magnani's performance is a major one and profoundly impressive.
This reviewer's personal opinion marked down the film as disturbingly
unpleasant and slow."

Seymour Peck, N. Y. Daily Compass, Dec. 13, 1950, p. 13, cols.
3–5: " 'The Miracle' is really all Magnani.  . . . one of the most ex-
citing solo performances the screen has known."

Alton Cook, N. Y. World-Telegram, Dec. 13, 1950, p. 50, cols.
1–2: "['The Miracle' is] charged with the same overwrought hysteria
that ran through his 'Stromboli.'  . . . the picture has an unpleasant
preoccupation with filth and squalor . . . exceedingly trying expe-
rience."

Time, Jan. 8, 1951, p. 72, cols. 2–3: "['The Miracle'] is second-
rate Rossellini despite a virtuoso performance by Anna Magnani."

Newsweek, Dec. 18, 1950, pp. 93–94, col. 3: "strong medicine for
most American audiences.  However, it shows what an artist of Ros-
sellini's character can do in the still scarcely explored medium of the
film short story."

Hollis Alpert, Sat. Rev. of Lit., Jan. 27, 1951, pp. 28–29: "pic-
torially the picture is a gem, with its sensitive evocation of a small
Italian town and the surrounding countryside near Salerno . . . .
Anna Magnani again demonstrates her magnificent qualities of acting.
The role is difficult . . . .

"But my quarrel would be with Mr. Rossellini, whose method of
improvisation from scene to scene . . . can also result in extraneous
detail that adds little, or even harms, the over-all effect."

[15] N. Y. Times, Dec. 28, 1950, p. 22, col. 1.

[16] *Id.*, Dec. 24, 1950, p. 1, cols. 2–3.

License Commissioner had exceeded his authority in that he was without powers of movie censorship.[17]

Upon the failure of the License Commissioner's effort to cut off showings of "The Miracle," the controversy took a new turn. On Sunday, January 7, 1951, a statement of His Eminence, Francis Cardinal Spellman, condemning the picture and calling on "all right thinking citizens" to unite to tighten censorship laws, was read at all masses in St. Patrick's Cathedral.[18]

The views of Cardinal Spellman aroused dissent among other devout Christians. Protestant clergymen, repre-

---

[17] *Joseph Burstyn, Inc.* v. *McCaffrey*, 198 Misc. 884, 101 N. Y. S. 2d 892.

[18] N. Y. Times, Jan. 8, 1951, p. 1, col. 2. The Cardinal termed "The Miracle" "a vile and harmful picture," "a despicable affront to every Christian" ("We believe in miracles. This picture ridicules that belief"), and finally "a vicious insult to Italian womanhood." As a consequence, he declared: "we, as the guardians of the moral law, must summon you and all people with a sense of decency to refrain from seeing it and supporting the venal purveyors of such pictures . . . ." *Id.*, at p. 14, cols. 2–3.

For completeness' sake, later incidents should be noted. Picketers from the Catholic War Veterans, the Holy Name Society, and other Catholic organizations—about 1,000 persons in all during one Sunday—paraded before the Paris Theatre. *Id.*, Dec. 29, 1950, p. 36, col. 3; Jan. 8, 1951, p. 1, col. 2; Jan. 9, 1951, p. 34, col. 7; Jan. 10, 1951, p. 22, col. 6; Jan. 15, 1951, p. 23, col. 3. A smaller number of counterpickets appeared on several days. *Id.*, Jan. 10, 1951, p. 22, col. 6; Jan. 20, 1951, p. 10, cols. 4–5. See also *id.*, Jan. 23, 1951, p. 21, col. 8; Jan. 25, 1951, p. 27, col. 7.

The Paris Theatre on two different evenings was emptied on threat of bombing. *Id.*, Jan. 21, 1951, p. 1, cols. 2–3; Jan. 28, 1951, p. 1, cols. 2–3. Coincidently with the proceedings before the New York Board of Regents which started this case on the way to this Court, the Paris Theatre also was having difficulties with the New York City Fire Department. The curious may follow the development of those incidents, not relevant here, in the N. Y. Times, Jan. 21, 1951, p. 53, cols. 4–5; Jan. 27, 1951, p. 11, col. 3; Feb. 6, 1951, p. 29, col. 8; Feb. 10, 1951, p. 15, col. 8; Feb. 15, 1951, p. 33, col. 2.

senting various denominations, after seeing the picture, found in it nothing "sacrilegious or immoral to the views held by Christian men and women," and with a few exceptions agreed that the film was "unquestionably one of unusual artistic merit." [19]

In this estimate some Catholic laymen concurred.[20] Their opinion is represented by the comment by Otto L. Spaeth, Director of the American Federation of Arts and prominent in Catholic lay activities:

"At the outbreak of the controversy, I immediately arranged for a private showing of the film. I invited a group of Catholics, competent and respected for their writings on both religious and cultural subjects. The essential approval of the film was unanimous.

"There was indeed 'blasphemy' in the picture— but it was the blasphemy of the villagers, who stopped at nothing, not even the mock singing of a

[19] Excerpts from letters and statements by a great many clergymen are reproduced in the Record before this Court, pages 95–140. The representative quotations in the text are from letters written by the Rev. H. C. DeWindt, Minister of the West Park Presbyterian Church, New York City, R. 97, and the Rev. W. J. Beeners of Princeton, New Jersey, R. 98, respectively.

[20] Catholic opinion generally, as expressed in the press, supported the view of the Legion of Decency and of Cardinal Spellman. See, for example, The [New York] Catholic News, Dec. 30, 1950, p. 10; Jan. 6, 1951, p. 10; Jan. 20, 1951, p. 10; Feb. 3, 1951, p. 10; Feb. 10, 1951, p. 12; and May 19, 1951, p. 12; Commonweal, Jan. 12, 1951, p. 351, col. 1; The [Brooklyn] Tablet, Jan. 20, 1951, p. 8, col. 4; *id.*, Jan. 27, 1951, p. 10, col. 3; *id.*, Feb. 3, 1951, p. 8, cols. 3–4; Martin Quigley, Jr., " 'The Miracle'—An Outrage"; The [San Francisco] Monitor, Jan. 12, 1951, p. 7, cols. 3–4 (reprinted from Motion Picture Herald, Jan. 6, 1951); The [Boston] Pilot, Jan. 6, 1951, p. 4. There doubtless were comments on "The Miracle" in other diocesan papers which circulate in various parts of the country, but which are not on file in the Library of Congress or the library of the Catholic University of America.

hymn to the Virgin, in their brutal badgering of the tragic woman. The scathing indictment of their evil behavior, implicit in the film, was seemingly overlooked by its critics." [21]

William P. Clancy, a teacher at the University of Notre Dame, wrote in The Commonweal, the well-known Catholic weekly, that "the film is not *obviously* blasphemous or obscene, either in its intention or execution." [22] The Commonweal itself questioned the wisdom of transforming Church dogma which Catholics may obey as "a free act" into state-enforced censorship for all. [23] Allen Tate, the well-known Catholic poet and critic, wrote: "The picture seems to me to be superior in acting and photography but inferior dramatically. . . . In the long run what Cardinal Spellman will have succeeded in doing is insulting the intelligence and faith of American Catholics with the assumption that a second-rate motion picture could in any way undermine their morals or shake their faith." [24]

At the time "The Miracle" was filmed, all the persons having significant positions in the production—producer, director, and cast—were Catholics. Roberto Rossellini, who had Vatican approval in 1949 for filming a life of St. Francis, using in the cast members of the Franciscan

---

[21] Spaeth, "Fogged Screen," Magazine of Art, Feb., 1951, p. 44; N. Y. Herald Tribune, Jan. 30, 1951, p. 18, col. 4.

[22] Clancy, "The Catholic as Philistine," The Commonweal, Mar. 16, 1951, pp. 567–569.

[23] The Commonweal, Mar. 2, 1951, pp. 507–508. Much the same view was taken by Frank Getlein writing in The Catholic Messenger, Mar. 22, 1951, p. 4, cols. 1–8, in an article bearing the headline: "Film Critic Gives Some Aspects of 'The Miracle' Story: Raises Questions Concerning Tactics of Organized Catholic Resistance Groups in New York." See also, "Miracles Do Happen," The New Leader, Feb. 5, 1951, p. 30, col. 2.

[24] N. Y. Times, Feb. 1, 1951, p. 24, col. 7.

516

Order, cabled Cardinal Spellman protesting against boycott of "The Miracle":

> "In *The Miracle* men are still without pity because they still have not come back to God, but God is already present in the faith, however confused, of that poor, persecuted woman; and since God is wherever a human being suffers and is misunderstood, *The Miracle* occurs when at the birth of the child the poor, demented woman regains sanity in her maternal love." [25]

In view of the controversy thus aroused by the picture, the Chairman of the Board of Regents appointed a committee of three Board members to review the action of the Motion Picture Division in granting the two licenses. After viewing the picture on Jan. 15, 1951, the committee declared it "sacrilegious." The Board four days later issued an order to the licensees to show cause why the licenses should not be cancelled in that the picture was "sacrilegious." The Board of Regents rescinded the licenses on Feb. 16, 1951, saying that the "mockery or profaning of these beliefs that are sacred to any portion of our citizenship is abhorrent to the laws of this great State." On review the Appellate Division upheld the Board of Regents, holding that the banning of any motion picture "that may fairly be deemed sacrilegious to the adherents of any religious group . . . is directly related to public peace and order" and is not a denial of religious freedom, and that there was "substantial evidence upon which the Regents could act." 278 App. Div. 253, 257, 258, 260, 104 N. Y. S. 2d 740, 743, 744–745, 747.

The New York Court of Appeals, with one judge concurring in a separate opinion and two others dissenting,

---

[25] *Id.,* Jan. 13, 1951, p. 10, col. 6; translation by Chworowsky, "The Cardinal: Critic and Censor," The Churchman, Feb. 1, 1951, p. 7, col. 2.

affirmed the order of the Appellate Division. 303 N. Y. 242, 101 N. E. 2d 665. After concluding that the Board of Regents acted within its authority and that its determination was not "one that no reasonable mind could reach," *id.*, at 250–255, 256–257, 101 N. E. 2d 665, 667–671, the majority held, first, that "sacrilegious" was an adequately definite standard, quoting a definition from Funk & Wagnalls' Dictionary and referring to opinions in this Court that in passing used the term "profane," which the New York court said was a synonym of "sacrilegious"; second, that the State's assurance "that no religion . . . shall be treated with contempt, mockery, scorn and ridicule . . . by those engaged in selling entertainment by way of motion pictures" does not violate the religious guarantee of the First Amendment; and third, that motion pictures are not entitled to the immunities from regulation enjoyed by the press, in view of the decision in *Mutual Film Corp.* v. *Ohio Industrial Comm'n*, 236 U. S. 230. *Id.*, at 255–256, 258–260, 260–262, 101 N. E. 2d 670–674. The two dissenting judges, after dealing with a matter of local law not reviewable here, found that the standard "sacrilegious" is unconstitutionally vague, and, finally, that the constitutional guarantee of freedom of speech applied equally to motion pictures and prevented this censorship. 303 N. Y. 242, 264, 101 N. E. 2d 665, 675. Both State courts, as did this Court, viewed "The Miracle."

Arguments by the parties and in briefs *amici* invite us to pursue to their farthest reach the problems in which this case is involved. Positions are advanced so absolute and abstract that in any event they could not properly determine this controversy. See *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 341, 346–348. We are asked to decide this case by choosing between two mutually exclusive alternatives: that motion pictures may be subjected to unrestricted censorship, or that they

518

must be allowed to be shown under any circumstances. But only the tyranny of absolutes would rely on such alternatives to meet the problems generated by the need to accommodate the diverse interests affected by the motion pictures in compact modern communities. It would startle Madison and Jefferson and George Mason, could they adjust themselves to our day, to be told that the freedom of speech which they espoused in the Bill of Rights authorizes a showing of "The Miracle" from windows facing St. Patrick's Cathedral in the forenoon of Easter Sunday,[26] just as it would startle them to be told that any picture, whatever its theme and its expression, could be barred from being commercially exhibited. The general principle of free speech, expressed in the First Amendment as to encroachments by Congress, and included as it is in the Fourteenth Amendment, binding on the States, must be placed in its historical and legal contexts. The Constitution, we cannot recall too often, is an organism, not merely a literary composition.

If the New York Court of Appeals had given "sacrilegious" the meaning it has had in Catholic thought since St. Thomas Aquinas formulated its scope, and had sustained a finding by the Board of Regents that "The Miracle" came within that scope, this Court would have to meet some of the broader questions regarding the relation to the motion picture industry of the guarantees of the First Amendment so far as reflected in the Fourteenth. But the New York court did not confine "sacrilegious" within such technical, Thomist limits, nor within any specific, or even approximately specified, limits. It may fairly be said that that court deemed "sacrilegious" a self-defining term, a word that carries a well-known, settled meaning in the common speech of men.

---

[26] That such offensive exploitation of modern means of publicity is not a fanciful hypothesis, see N. Y. Times, April 14, 1952, p. 1, col. 4.

So far as the Court of Appeals sought to support its notion that "sacrilegious" has the necessary precision of meaning which the Due Process Clause enjoins for statutes regulating men's activities, it relied on this definition from Funk & Wagnalls' Dictionary: "The act of violating or profaning anything sacred." But this merely defines by turning an adjective into a noun and bringing in two new words equally undefined. It leaves wide open the question as to what persons, doctrines or things are "sacred." It sheds no light on what representations on the motion picture screen will constitute "profaning" those things which the State censors find to be "sacred."

To criticize or assail religious doctrine may wound to the quick those who are attached to the doctrine and profoundly cherish it. But to bar such pictorial discussion is to subject non-conformists to the rule of sects.

Even in *Mutual Film Corp.* v. *Ohio Industrial Comm'n,* 236 U. S. 230, it was deemed necessary to find that the terms "educational, moral, amusing or harmless" do not leave "decision to arbitrary judgment." Such general words were found to "get precision from the sense and experience of men." *Id.,* at 245, 246. This cannot be said of "sacrilegious." If there is one thing that the history of religious conflicts shows, it is that the term "sacrilegious"—if by that is implied offense to the deep convictions of members of different sects, which is what the Court of Appeals seems to mean so far as it means anything precisely—does not gain "precision from the sense and experience of men."

The vast apparatus of indices and digests, which mirrors our law, affords no clue to a judicial definition of sacrilege. Not one case, barring the present, has been uncovered which considers the meaning of the term in any context. Nor has the practice under the New York law contributed light. The Motion Picture Division of the Education Department does not support with ex-

planatory statements its action on any specific motion picture, which we are advised is itself not made public. Of the fifty-odd reported appeals to the Board of Regents from denials of licenses by the Division, only three concern the category "sacrilegious." [27] In these cases, as in others under the Act, the Board's reported opinion confines itself to a bare finding that the film was or was not "sacrilegious," without so much as a description of the allegedly offensive matter, or even of the film as a whole to enlighten the inquirer. Well-equipped law libraries are not niggardly in their reflection of "the sense and experience of men," but we must search elsewhere for any which gives to "sacrilege" its meaning.

Sacrilege,[28] as a restricted ecclesiastical concept, has a long history. Naturally enough, religions have sought to protect their priests and anointed symbols from physical injury.[29] But history demonstrates that the term is hopelessly vague when it goes beyond such ecclesiastical definiteness and is used at large as the basis for punishing deviation from doctrine.

Etymologically "sacrilege" is limited to church-robbing: *sacer,* sacred, and *legere,* to steal or pick out. But we are

---

[27] *In the Matter of "The Puritan,"* 60 N. Y. St. Dept. 163 (1939); *In the Matter of "Polygamy,"* 60 N. Y. St. Dept. 217 (1939); *In the Matter of "Monja y Casada—Virgen y Martir"* (*"Nun and Married—Virgin and Martyr"*), 52 N. Y. St. Dept. 488 (1935).

[28] Since almost without exception "sacrilegious" is defined in terms of "sacrilege," our discussion will be directed to the latter term. See Bailey, Universal Etymological English Dictionary (London, 1730), "Sacrilegious"—"of, pertaining to, or guilty of Sacrilege"; Funk & Wagnalls' New Standard Dictionary (1937), "Sacrilegious"—"Having committed or being ready to commit sacrilege. Of the nature of sacrilege; as, *sacrilegious* deeds."

[29] For general discussions of "sacrilege," see Encyclopaedia of Religion and Ethics (Hastings ed., 1921), "Sacrilege" and "Tabu"; Rev. Thomas Slater, A Manual of Moral Theology (1908), 226–230; The Catholic Encyclopedia (1912), "Sacrilege"; and Encyclopaedia Britannica, "Sacrilege."

told that "already in Cicero's time it had grown to include in popular speech any insult or injury to [sacred things]." [30] "In primitive religions [sacrilege is] inclusive of almost every serious offence even in fields now regarded as merely social or political . . . ." [31] The concept of "tabu" in primitive society is thus close to that of "sacrilege." [32] And in "the Theodosian Code the various crimes which are accounted sacrilege include—apostasy, heresy, schism, Judaism, paganism, attempts against the immunity of churches and clergy or privileges of church courts, the desecration of sacraments, etc., and even Sunday. Along with these crimes against religion went treason to the emperor, offences against the laws, especially counterfeiting, defraudation in taxes, seizure of confiscated property, evil conduct of imperial officers, etc." [33] During the Middle Ages the Church considerably delimited the application of the term. St. Thomas Aquinas classified the objects of "sacrilege" as persons, places, and thing.[34] The injuries which would constitute

[30] Encyclopaedia Britannica (1951), "Sacrilege."

[31] *Ibid.*

[32] See Encyclopaedia of Religion and Ethics (Hastings ed., 1921), "Tabu."

[33] Encyclopaedia Britannica (1951), "Sacrilege."

[34] St. Thomas Aquinas, Summa Theologica, part II–II, question 99. The modern Codex Juris Canonici does not give any definition of "sacrilege," but merely says it "shall be punished by the Ordinary in proportion to the gravity of the fault, without prejudice to the penalties established by law . . . ." See Bouscaren and Ellis, Canon Law (1946), 857. 2 Woywod, A Practical Commentary on the Code of Canon Law (1929), par. 2178, 477–478, thus defines sacrilege: "Sacrilege consists in the unworthy use or treatment of sacred things and sacred persons. Certain things are of their nature sacred (e. g., the Sacraments); others become so by blessing or consecration legitimately bestowed on things or places by authority of the Church. Persons are rendered sacred by ordination or consecration or by other forms of dedication to the divine service by authority of the Church (e. g., by first tonsure, by religious profession)."

522

"sacrilege" received specific and detailed illustration.[35] This teaching of Aquinas is, I believe, still substantially the basis of the official Catholic doctrine of sacrilege. Thus, for the Roman Catholic Church, the term came to have a fairly definite meaning, but one, in general, limited to protecting things physical against injurious acts.[36] Apostasy, heresy, and blasphemy coexisted as religious crimes alongside sacrilege; they were peculiarly in the realm of religious dogma and doctrine, as "sacrilege" was not. It is true that Spelman, writing "The History and Fate of Sacrilege" in 1632, included in "sacrilege" acts whereby "the very Deity is invaded, profaned, or robbed of its glory . . . . In this high sin are blasphemers,

[35] After his method of raising objections and then refuting them, St. Thomas Aquinas defends including within the proscription of "sacrilege," anyone "who disagree[s] about the sovereign's decision, and doubt[s] whether the person chosen by the sovereign be worthy of honor" and "any man [who] shall allow the Jews to hold public offices." Summa Theologica, part II–II, question 99, art. 1.

[36] Rev. Thomas Slater, S. J., A Manual of Moral Theology (1908), c. VI, classifies and illustrates the modern theological view of "sacrilege":

Sacrilege against sacred persons: to use physical violence against a member of the clergy; to violate "the privilege of immunity of the clergy from civil jurisdiction, as far as this is still in force"; to violate a vow of chastity.

Sacrilege against sacred places: to violate the immunity of churches and other sacred places "as far as this is still in force"; to commit a crime such as homicide, suicide, bloody attack there; to break by sexual act a vow of chastity there; to bury an infidel, heretic, or excommunicate in churches or cemeteries canonically established; or to put the sacred place to a profane use, as a secular courtroom, public market, banquet hall, stable, etc.

Sacrilege against sacred things: to treat with irreverence, contempt, or obscenity the sacraments (particularly the Eucharist), Holy Scriptures, relics, sacred images, etc., to steal sacred things, or profane things from sacred places; to commit simony; or to steal, confiscate, or damage wilfully ecclesiastical property. See also, The Catholic Encyclopedia, "Sacrilege."

sorcerers, witches, and enchanters." [37] But his main theme was the "spoil of church lands done by Henry VIII" and the misfortunes that subsequently befell the families of the recipients of former ecclesiastical property as divine punishment.

To the extent that English law took jurisdiction to punish "sacrilege," the term meant the stealing from a church, or otherwise doing damage to church property.[38] This special protection against "sacrilege," that is, property damage, was granted only to the Established Church.[39] Since the repeal less than a century ago of the English law punishing "sacrilege" against the property of the Established Church, religious property has received little special protection. The property of all sects has had substantially the same protection as is accorded non-religious property.[40] At no time up to the present has English law known "sacrilege" to be used in any wider sense than the physical injury to church property. It is true that, at times in the past, English law has

[37] Sir Henry Spelman, The History and Fate of Sacrilege (2d ed., 1853), 121–122. Two priests of the Anglican Church prepared a long prefatory essay to bring Spelman's data up to the date of publication of the 1853 edition. Their essay shows their understanding also of "sacrilege" in the limited sense. *Id.*, at 1–120.

[38] 2 Russell, Crime (10th ed., 1950), 975–976; Stephen, A Digest of the Criminal Law (9th ed., 1950), 348–349. See 23 Hen. VIII, c. 1, § III; 1 Edw. VI, c. 12, § X; 1 Mary, c. 3, §§ IV–VI.

[39] 7 & 8 Geo. IV, c. 29, § X, which the marginal note summarized as "Sacrilege, when capital," read: "if any Person shall break and enter any Church or Chapel, and steal therein any Chattel . . . [he] shall suffer Death as a Felon." This statute was interpreted to apply only to buildings of the established church. *Rex* v. *Nixon*, 7 Car. & P. 442 (1836).

[40] 7 & 8 Geo. IV, c. 29, § X, was repealed by 24 & 25 Vict., c. 95. The Larceny Act and the Malicious Injuries to Property Act, both of 1861, treated established church property substantially the same as all other property. 24 & 25 Vict., c. 96, § 50; c. 97, §§ 1, 11, 39, superseded by Larceny Act, 1916, 6 & 7 Geo. V, c. 50, § 24.

taken jurisdiction to punish departures from accepted dogma or religious practice or the expression of particular religious opinions, but never have these "offenses" been denominated "sacrilege." Apostasy, heresy, offenses against the Established Church, blasphemy, profanation of the Lord's Day, etc., were distinct criminal offenses, characterized by Blackstone as "offences against God and religion." [41] These invidious reflections upon religious susceptibilities were not covered under sacrilege as they might be under the Court of Appeals' opinion. Anyone doubting the dangerous uncertainty of the New York definition, which makes "sacrilege" overlap these other "offenses against religion," need only read Blackstone's account of the broad and varying content given each of these offenses.

A student of English lexicography would despair of finding the meaning attributed to "sacrilege" by the New York court.[42] Most dictionaries define the concept in the limited sense of the physical abuse of physical objects. The definitions given for "sacrilege" by two dictionaries published in 1742 and 1782 are typical. Bailey's defined it as "the stealing of Sacred Things, Church Robbing; an Alienation to Laymen, and to profane and common Purposes, of what was given to religious Persons, and to pious Uses." [43] Barclay's said it is "the crime of taking any thing dedicated to divine worship, or profaning any thing sacred," where "to profane" is defined "to apply any thing sacred to common uses. To be irreverent to sacred persons or things." [44] The

---

[41] Blackstone, bk. IV, c. 4, 41–64.

[42] Compare the definitions of "sacrilege" and "blasphemy" in the dictionaries, starting with Cockeram's 1651 edition, which are collected in the Appendix, *post*, p. 533.

[43] Bailey, An Universal Etymological English Dictionary (London, 1742), "Sacrilege."

[44] Barclay, A Complete and Universal English Dictionary (London, 1782), "Sacrilege."

same dictionaries defined "blasphemy," a peculiarly verbal offense, in much broader terms than "sacrilege," indeed in terms which the New York court finds encompassed by "sacrilegious." For example, Barclay said "blasphemy" is "an offering some indignity to God, any person of the Trinity, any messengers from God, his holy writ, or the doctrines of revelation." [45] It is hardly necessary to comment that the limits of this definition remain too uncertain to justify constraining the creative efforts of the imagination by fear of pains and penalties imposed by a necessarily subjective censorship. It is true that some earlier dictionaries assigned to "sacrilege" the broader meaning of "abusing Sacraments or holy Mysteries," [46] but the broader meaning is more indefinite, not less. Noah Webster first published his American Dictionary in 1828. Both it and the later dictionaries published by the Merriam Company, Webster's International Dictionary and Webster's New International Dictionary, have gone through dozens of editions and printings, revisions and expansions. In all editions throughout 125 years, these American dictionaries have defined "sacrilege" and "sacrilegious" to echo substantially the narrow, technical definitions from the earlier British dictionaries collected in the Appendix, *post,* p. 533.[47]

---

[45] *Id.,* "Blasphemy."

[46] Thomas Blount, Glossographia (3d ed., London, 1670).

[47] Webster's Compendious Dictionary of the English Language (1806): "Sacrilege"—"the robbery of a church or chapel." "Sacrilegious"—"violating a thing made sacred."

Webster's American Dictionary (1828): "Sacrilege"—"The crime of violating or profaning sacred things; or the alienating to laymen or to common purposes what has been appropriated or consecrated to religious persons or uses." "Sacrilegious"—"Violating sacred things; polluted with the crime of sacrilege."

Webster's International Dictionary (G. & C. Merriam & Co., 1890): "Sacrilege"—"The sin or crime of violating or profaning sacred things; the alienating to laymen, or to common purposes,

526

The New York Court of Appeals' statement that the dictionary "furnishes a clear definition," justifying the vague scope it gave to "sacrilegious," surely was made without regard to the lexicographic history of the term. As a matter of fact, the definition from Funk & Wagnalls' used by the Court of Appeals is taken straight from 18th Century dictionaries, particularly Doctor Johnson's.[48] In light of that history it would seem that the Funk &

what has been appropriated or consecrated to religious persons or uses." "Sacrilegious"—"violating sacred things; polluted with sacrilege; involving sacrilege; profane; impious."

Webster's New International Dictionary (G. & C. Merriam Co., 1st ed., 1909): "Sacrilege"—"The sin or crime of violating or profaning sacred things; specif., the alienating to laymen, or to common purposes, what has been appropriated or consecrated to religious persons or uses." "Sacrilegious"—"Violating sacred things; polluted with, or involving, sacrilege; impious." Repeated in the 1913, 1922, 1924, 1928, 1933 printings, among others.

Webster's New International Dictionary (G. & C. Merriam Co., 2d ed., 1934): "Sacrilege"—"The crime of stealing, misusing, violating, or desecrating that which is sacred, or holy, or dedicated to sacred uses. Specif.: a *R. C. Ch.* The sin of violating the conditions for a worthy reception of a sacrament. b Robbery from a church; also, that which is stolen. c Alienation to laymen, or to common purposes, of what has been appropriated or consecrated to religious persons or uses." "Sacrilegious"—"Committing sacrilege; characterized by or involving sacrilege; polluted with sacrilege; as, *sacrilegious* robbers, depredations, or acts." Repeated in the 1939, 1942, 1944, 1949 printings, among others.

[48] Funk & Wagnalls' Standard Dictionary of the English Language, which was first copyrighted in 1890, defined sacrilege as follows in the 1895 printing: "1. The act of violating or profaning anything sacred. 2. *Eng. Law* (1) The larceny of consecrated things from a church; the breaking into a church with intent to commit a felony, or breaking out after a felony. (2) Formerly, the selling to a layman of property given to pious uses." This definition remained unchanged through many printings of that dictionary. The current printing of Funk & Wagnalls' New Standard Dictionary of the English Language, first copyrighted in 1913, carries exactly the same definition of "sacrilege" except that the first definition has been expanded to read: "The

Wagnalls' definition uses "sacrilege" in its historically restricted meaning, which was not, and could hardly have been, the basis for condemning "The Miracle.". If the New York court reads the Funk & Wagnalls' definition in a broader sense, in a sense for which history and experience provide no gloss, it inevitably left the censor free to judge by whatever dogma he deems "sacred" and to ban whatever motion pictures he may assume would "profane" religious doctrine widely enough held to arouse protest.

Examination of successive editions of the Encyclopaedia Britannica over nearly two centuries up to the present day gives no more help than the dictionaries. From 1768 to the eleventh edition in 1911, merely a brief dictionary-type definition was given for "sacrilege."[49] The eleventh edition, which first published a longer article, was introduced as follows: "the violation or profanation of sacred things, a crime of varying scope in different religions. It is naturally much more general and accounted more dreadful in those primitive religions in

---

act of violating or profaning anything sacred, including sacramental vows."

Funk & Wagnalls' Standard Dictionary (1895) defined "to profane" as "1. To treat with irreverence or abuse; make common or unholy; desecrate; pollute. 2. Hence, to put to a wrong or degrading use; debase." The New Standard Dictionary adds a third meaning: "3. To vulgarize; give over to the crowd."

[49] Encyclopaedia Britannica, 2d ed., 1782: "Sacrilege"—"the crime of profaning sacred things, or those devoted to the service of God."

3d ed., 1797: "Sacrilege"—"the crime of profaning sacred things, or things devoted to God; or of alienating to laymen, for common purposes, what was given to religious persons and pious uses."

8th ed., 1859: "Sacrilege"—same as 3d ed., 1797.

9th ed., 1886: "Sacrilege"—A relatively short article the author of which quite apparently had a restricted definition for "sacrilege": "robbery of churches," "breaking or defacing of an altar, crucifix, or cross," etc.

which cultural objects play so great a part, than in more highly spiritualized religions where they tend to disappear. But wherever the idea of sacred exists, sacrilege is possible." [50]  The article on "sacrilege" in the current edition of the Encyclopaedia Britannica is substantially the same as that in the 1911 edition.

History teaches us the indefiniteness of the concept "sacrilegious" in another respect. In the case of most countries and times where the concept of sacrilege has been of importance, there has existed an established church or a state religion. That which was "sacred," and so was protected against "profaning," was designated in each case by ecclesiastical authority. What might have been definite when a controlling church imposed a detailed scheme of observances becomes impossibly confused and uncertain when hundreds of sects, with widely disparate and often directly conflicting ideas of sacredness, enjoy, without discrimination and in equal measure, constitutionally guaranteed religious freedom. In the Rome of the late emperors, the England of James I, or the Geneva of Calvin, and today in Roman Catholic Spain, Mohammedan Saudi Arabia, or any other country with a monolithic religion, the category of things sacred might have clearly definable limits. But in America the multiplicity of the ideas of "sacredness" held with equal but conflicting fervor by the great number of religious groups makes the term "sacrilegious" too indefinite to satisfy constitutional demands based on reason and fairness.

If "sacrilegious" bans more than the physical abuse of sacred persons, places, or things, if it permits censorship of religious opinions, which is the effect of the holding below, the term will include what may be found to be "blasphemous." England's experience with that treacherous word should give us pause, apart from our

---

[50] Encyclopaedia Britannica (11th ed., 1911), "Sacrilege."

requirements for the separation of Church and State. The crime of blasphemy in Seventeenth Century England was the crime of dissenting from whatever was the current religious dogma.[51]   King James I's "Book of Sports" was first required reading in the churches; later all copies were consigned to the flames.   To attack the mass was once blasphemous; to perform it became so.   At different times during that century, with the shifts in the attitude of government towards particular religious views, persons who doubted the doctrine of the Trinity (*e. g.*, Unitarians, Universalists, etc.) or the divinity of Christ, observed the Sabbath on Saturday, denied the possibility of witchcraft, repudiated child baptism or urged methods of baptism other than sprinkling, were charged as blasphemers, or their books were burned or banned as blasphemous.   Blasphemy was the chameleon phrase which meant the criticism of whatever the ruling authority of the moment established as orthodox religious doctrine.[52]   While it is true that blasphemy prosecutions

---

[51] Schroeder, Constitutional Free Speech (1919), 178–373, makes a lengthy review of "Prosecutions for Crimes Against Religion."   The examples in the text are from Schroeder. See also Encyclopaedia of the Social Sciences, "Blasphemy"; Encyclopaedia of Religion and Ethics, "Blasphemy"; Nokes, A History of the Crime of Blasphemy (1928).

[52] 1 Yorke, The Life of Lord Chancellor Hardwicke (1913), 80, writes thus of the prosecution of Thomas Woolston for blasphemy: "The offence, in the first place, consisted in the publication in 1725 of a tract entitled *A Moderator between an Infidel and an Apostate,* in which the author questioned the historical accuracy of the Resurrection and the Virgin Birth.   Such speculations, however much they might offend the religious feeling of the nation, would not now arouse apprehensions in the civil government, or incur legal penalties; but at the time of which we are writing, when the authority of government was far less stable and secure and rested on far narrower foundations than at present, such audacious opinions were considered, not without some reason, as a menace, not only to religion but to the state."

have continued in England—although in lessening numbers—into the present century,[53] the existence there of an established church gives more definite contours to the crime in England than the term "sacrilegious" can possibly have in this country. Moreover, the scope of the English common-law crime of blasphemy has been considerably limited by the declaration that "if the decencies of controversy are observed, even the fundamentals of religion may be attacked," [54] a limitation which the New York court has not put upon the Board of Regents' power to declare a motion picture "sacrilegious."

In *Cantwell* v. *Connecticut,* 310 U. S. 296, 310, Mr. Justice Roberts, speaking for the whole Court, said: "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor." Conduct and beliefs dear to one may seem the rankest "sacrilege" to another. A few examples suffice to show the difficulties facing a conscientious censor or motion picture producer or distributor in determining what the New York statute condemns as sacrilegious. A motion picture portraying Christ as divine—for example, a movie showing medieval Church art—would offend the religious opinions of the members of several Protestant denominations who do not believe in the Trinity, as well as those of a non-Christian faith. Conversely, one showing Christ as merely an ethical teacher could not but offend millions of Christians of many denominations. Which is "sacrilegious"? The doctrine of transubstantiation, and the veneration of relics or particular stone and wood embodiments of saints or divinity, both sacred to

---

[53] See, *e. g., Rex* v. *Boulter,* 72 J. P. 188 (1908); *Bowman* v. *Secular Society, Ltd.,* [1917] A. C. 406.

[54] *Reg.* v. *Ramsay,* 15 Cox's C. C. 231, 238 (1883) (Lord Coleridge's charge to the jury); *Bowman* v. *Secular Society, Ltd.,* [1917] A. C. 406.

Catholics, are offensive to a great many Protestants, and therefore for them sacrilegious in the view of the New York court. Is a picture treating either subject, whether sympathetically, unsympathetically, or neutrally, "sacrilegious"? It is not a sufficient answer to say that "sacrilegious" is definite, because all subjects that in any way might be interpreted as offending the religious beliefs of any one of the 300 sects of the United States [55] are banned in New York. To allow such vague, undefinable powers of censorship to be exercised is bound to have stultifying consequences on the creative process of literature and art—for the films are derived largely from literature. History does not encourage reliance on the wisdom and moderation of the censor as a safeguard in the exercise of such drastic power over the minds of men. We not only do not know but cannot know what is condemnable by "sacrilegious." And if we cannot tell, how are those to be governed by the statute to tell?

It is this impossibility of knowing how far the form of words by which the New York Court of Appeals explained "sacrilegious" carries the proscription of religious subjects that makes the term unconstitutionally vague.[56] To stop short of proscribing all subjects that might conceivably be interpreted to be religious, inevitably creates a situation whereby the censor bans only that against which

---

[55] The latest available statistics of the Bureau of the Census give returns from 256 denominations; 57 other denominations, which did not report, are listed. Bureau of the Census, Religious Bodies: 1936, Vol. I, iii, 7.

[56] It is not mere fantasy to suggest that the effect of a ban of the "sacrilegious" may be to ban all motion pictures dealing with any subject that might be deemed religious by any sect. The industry's self-censorship has already had a distorting influence on the portrayal of historical figures. "Pressure forced deletion of the clerical background of Cardinal Richelieu from *The Three Musketeers*. The [Motion Picture Production] code provision appealed to was the section providing that ministers should not be portrayed as villains." Note,

there is a substantial outcry from a religious group. And that is the fair inference to be drawn, as a matter of experience, from what has been happening under the New York censorship. Consequently the film industry, normally not guided by creative artists, and cautious in putting large capital to the hazards of courage, would be governed by its notions of the feelings likely to be aroused by diverse religious sects, certainly the powerful ones. The effect of such demands upon art and upon those whose function is to enhance the culture of a society need not be labored.

To paraphrase Doctor Johnson, if nothing may be shown but what licensors may have previously approved, power, the yea-or-nay-saying by officials, becomes the standard of the permissible. Prohibition through words that fail to convey what is permitted and what is prohibited for want of appropriate objective standards, offends Due Process in two ways. First, it does not sufficiently apprise those bent on obedience of law of what may reasonably be foreseen to be found illicit by the law-enforcing authority, whether court or jury or administrative agency. Secondly, where licensing is rested, in the first instance, in an administrative agency, the available judicial review is in effect rendered inoperative. On the basis of such a portmanteau word as "sacrilegious," the judiciary has no standards with which to judge the validity of administrative action which necessarily involves, at least in large measure, subjective determinations. Thus, the administrative first step becomes the last step.

---

"Motion Pictures and the First Amendment," 60 Yale L. J. 696, 716, n. 42.

The press recently reported that plans are being made to film a "Life of Martin Luther." N. Y. Times, April 27, 1952, § 2, p. 5, col. 7. Could Luther be sympathetically portrayed and not appear "sacrilegious" to some; or unsympathetically, and not to others?

From all that has been said one is compelled to conclude that the term "sacrilegious" has come down the stream of time encrusted with a specialized, strictly confined meaning, pertaining to things in space not things in the mind. The New York Court of Appeals did not give the term this calculable content. It applied it to things in the mind, and things in the mind so undefined, so at large, as to be more patently in disregard of the requirement for definiteness, as the basis of proscriptions and legal sanctions for their disobedience, than the measures that were condemned as violative of Due Process in *United States* v. *Cohen Grocery Co.,* 255 U. S. 81; *A. B. Small Co.* v. *American Sugar Refining Co.,* 267 U. S. 233; *Connally* v. *General Construction Co.,* 269 U. S. 385; *Winters* v. *New York,* 333 U. S. 507; *Kunz* v. *New York,* 340 U. S. 290. This principle is especially to be observed when what is so vague seeks to fetter the mind and put within unascertainable bounds the varieties of religious experience.

APPENDIX TO OPINION OF MR. JUSTICE FRANKFURTER.*

Cockeram, English Dictionarie (10th ed., London, 1651).
   Blasphemy: No entry.
   Sacrilege: "The robbing of a Church, the stealing of holy things, abusing of Sacraments or holy Mysteries."
   Sacrilegious: "Abominable, very wicked."
Blount, Glossographia (3d ed., London, 1670).
   Blasphemy: No entry.
   Sacrilege: "the robbing a Church, or other holy consecrated place, the stealing holy things, or abusing Sacraments or holy Mysteries."
   Sacrilegious: "that robs the Church; wicked, extremely bad."

---

*See Mathews, A Survey of English Dictionaries (1933).

Blount, A Law-Dictionary (London, 1670).
   Blasphemy: No entry.
   Sacrilege: No entry.
Phillips, The New World of Words (3d ed., London, 1671).
   Blasphemy: "an uttering of reproachfull words, tending either to the dishonour of God, or to the hurt and disgrace of any mans name and credit."
   Sacrilegious: "committing Sacriledge, *i. e.* a robbing of Churches, or violating of holy things."
Cowel, The Interpreter of Words and Terms (Manley ed., London, 1701).
   Blasphemy: No entry.
   Sacrilege: "an Alienation to Lay-Men, and to profane or common purposes, of what was given to Religious Persons, and to Pious Uses, etc."
Rastell, Law Terms (London, 1708).
   Blasphemy: No entry.
   Sacrilege: "is, when one steals any Vessels, Ornaments, or Goods of Holy Church, which is felony, 3 Cro. 153, 154."
Kersey, A General English Dictionary (3d ed., London, 1721).
   Blasphemy: "an uttering of reproachful Words, that tend to the Dishonour of God, &c."
   Sacrilege: "the stealing of Sacred Things, Church robbing."
Cocker, English Dictionary (London, 1724).
   Blasphemy: No entry.
   Sacrilege: "robbing the Church, or what is dedicated thereto."
Bailey, Universal Etymological English Dictionary (London, 1730).
   Blasphemy: "an uttering of reproachful words tending to the dishonour of God, &c. vile, base language."

Sacrilege: "the stealing of sacred Things, Church-Robbing; the Crime of profaning sacred Things, or alienating to Laymen, or common Uses, what was given to pious Uses and religious Persons."

Coles, An English Dictionary (London, 1732).

Blasphemy: "reproach."

Sacrilege: "the robbing of God, the church, &c."

Bullokar, The English Expositor (14th ed., London, 1731).

Blasphemy: No entry.

Sacrilege: "The Robbing of a Church; the Stealing of holy things, or Abusing of Sacraments or holy Mysteries."

Defoe, A Compleat English Dictionary (Westminster, 1735).

Blasphemy: "vile or opprobrious Language, tending to the Dishonour of God."

Sacrilege: "the stealing of sacred Things, Church robbing."

Bailey, An Universal Etymological English Dictionary (London, 1742).

Blasphemy: "Cursing and Swearing, vile reproachful Language, tending to the Dishonour of God."

Sacrilege: "the stealing of Sacred Things, Church Robbing; an Alienation to Laymen, and to profane and common Purposes, of what was given to religious Persons, and to pious Uses."

Martin, A New Universal English Dictionary (London, 1754).

Blasphemy: "cursing, vile language tending to the dishonour of God or religion."

Sacrilege: "the stealing things out of a holy place, or the profaning things devoted to God."

Johnson, A Dictionary of the English Language (2d ed., London, 1755).

Blasphemy: "strictly and properly, is an offering of some indignity, or injury, unto God himself, either by words or writing."

Sacrilege: "The crime of appropriating to himself what is devoted to religion; the crime of robbing heaven; the crime of violating or profaning things sacred."

Rider, A New Universal English Dictionary (London, 1759).

Blasphemy: "an offering some indignity to God, any person of the Trinity, any messengers from God; his holy writ, or the doctrines of revelation, either by speaking or writing any thing ill of them, or ascribing any thing ill to them inconsistent with their natures and the reverence we owe them."

Sacrilege: "the crime of taking any thing dedicated to divine worship. The crime of profaning any thing sacred."

Profane: "to apply any thing sacred to common use. To be irreverent to sacred persons or things. To put to a wrong use."

Gordon and Marchant, A New Complete English Dictionary (London, 1760).

Blasphemy: "is an offering some indignity to God himself."

Sacrilege: "is the crime of appropriating to himself what is devoted to religion; the crime of robbing Heaven."

Buchanan, A New English Dictionary (London, 1769).

Blasphemy: "Language tending to the dishonour of God."

Sacrilege: "The stealing things out of a holy place."

Cunningham, A New and Complete Law-Dictionary (London, 1771).

    Blasphemy: A long definition reading in part: "Is an injury offered to God, by denying that which is due and belonging to him, or attributing to him what is not agreeable to his nature."

    Sacrilege: "Is church robbery, or a taking of things out of a holy place; as where a person steals any vessels, ornaments, or goods of the church. And it is said to be a robbery of God, at least of what is dedicated to his service. 2 Cro. 153, 154.

    ". . . an alienation to lay-men, and to profane or common purposes, of what was given to religious persons, and to pious uses."

Kenrick, A New Dictionary of the English Language (London, 1773).

    Blasphemy: "Treating the name and attributes of the Supreme Being with insult and indignity."

    Sacrilege: "The crime of appropriating to himself what is devoted to religion; *the crime of robbing heaven,* says Johnson; the crime of violating or profaning things sacred."

    Profane: "To violate; to pollute.—To put to wrong use."

Ash, The New and Complete Dictionary of the English Language (London, 1775).

    Blasphemy: "The act of speaking or writing reproachfully of the Divine Being, the act of attributing to the creature that which belongs to the Creator."

    Sacrilege: "The act of appropriating to one's self what is devoted to religion, the crime of violating sacred things."

Dyche, A New General English Dictionary (London, 1777).

    Blasphemy: "the reproaching or dishonouring God, religion, and holy things."

    Sacrilege: "the stealing or taking away those things that were appropriated to religious uses or designs."

    Sacrilegious: "of a profane, thievish nature, sort, or disposition."

Barclay, A Complete and Universal English Dictionary (London, 1782).

    Blasphemy: "an offering some indignity to God, any person of the Trinity, any messengers from God, his holy writ, or the doctrines of revelation."

    Sacrilege: "the crime of taking any thing dedicated to divine worship, or profaning any thing sacred."

    Profane: "to apply any thing sacred to common use. To be irreverent to sacred persons or things."

Lemon, English Etymology (London, 1783).

    Blaspheme: *"to speak evil of any one; to injure his fame, or reputation."*

    Sacrilege: No entry.

Entick, New Spelling Dictionary (London, 1786).

    Blasphemy: "indignity offered to God."

    Blasphemer: "one who abuses God."

    Sacrilege: "the robbery of a church or chapel."

    Sacrilegious: "violating a thing made sacred."

Burn, A New Law Dictionary (Dublin, 1792).

    Blasphemy: "See Prophaneness."

    Profaneness: A long definition, not reproduced here.

    Sacrilege: "robbing of the church, or stealing things out of a sacred place."

Sheridan, A Complete Dictionary of the English Language (6th ed., Phila., 1796).

    Blasphemy: "Offering of some indignity to God."

    Sacrilege: "The crime of robbing a church."

Scott, Dictionary of the English Language (Edinburgh, 1797).

> Blasphemy: "indignity offered to God."
>
> Sacrilege: "the robbery of a church, &c."

Richardson, A New Dictionary of the English Language (London, 1839).

> Blasphemy: "To attack, assail, insult, (the name, the attributes, the ordinances, the revelations, the will or government of God.)"
>
> Sacrilege: "to take away, to steal any thing *sacred*, or consecrated, or dedicated to holy or religious uses."

Bell, A Dictionary and Digest of the Law of Scotland (Edinburgh, 1861).

> Blasphemy: "is the denying or vilifying of the Deity, by speech or writing."
>
> Sacrilege: "is any violation of things dedicated to the offices of religion."

Staunton, An Ecclesiastical Dictionary (N. Y., 1861).

> Blasphemy: A long entry.
>
> Sacrilege: "The act of violating or subjecting sacred things to profanation; or the desecration of objects consecrated to God. Thus, the robbing of churches or of graves, the abuse of sacred vessels and altars by employing them for unhallowed purposes, the plundering and misappropriation of alms and donations, are acts of sacrilege, which in the ancient Church were punished with great severity."

Bouvier, A Law Dictionary (11th ed., Phila., 1866).

> Blasphemy: "To attribute to God that which is contrary to his nature, and does not belong to him, and to deny what does; or it is a false reflection uttered with a malicious design of reviling God."

Sacrilege: "The act of stealing from the temples or churches dedicated to the worship of God, articles consecrated to divine uses."

Shipley, A Glossary of Ecclesiastical Terms (London, 1872).

Blasphemy: "Denying the existence or providence of God; contumelous reproaches of Jesus Christ; profane scoffing at the holy Scriptures, or exposing any part thereof to contempt or ridicule."

Sacrilege: "The profanation or robbery of persons or things which have been solemnly dedicated to the service of God.  *v*. 24 & 25 Vict. c. 96, s. 50."

Brown, A Law Dictionary (Sprague ed., Albany, 1875).

Blasphemy: "To revile at or to deny the truth of Christianity as by law established, is a blasphemy, and as such is punishable by the common law. . . ."

Sacrilege: "A desecration of any thing that is holy. The alienation of lands which were given to religious purposes to laymen, or to profane and common purposes, was also termed sacrilege."