**R. K. O. PICTURES, INC. et, Plaintiffs, v. HISSONG, as Superintendent of Division of Film Censorship, etc., Defendants.**

Common Pleas Court, Franklin County.

No. 189797.   Decided July 31, 1954.

494

Wright, Harlor, Purpus, Morris & Arnold, Columbus, for plaintiffs.

C. William O'Neill, Atty. Genl., Robert E. Leach, Chief Counsel, Gwynne B. Myers, Asst. Atty. Genl., Columbus, for defendants.

## OPINION

By BARTLETT, J.

The plaintiffs seek to restrain the enforcement of the Motion Picture Censorship Laws of Ohio. (Secs. 3305.01— 3305.99, inclusive, R. C.) These statutes require each motion picture film shall be submitted to the defendant for examination and censorship prior to public exhibition in Ohio; and provide that "only such films as are, in the judgment and discretion of the department of education, of a moral, educational, or amusing and harmless character shall be passed and approved by such department." The fees required to be paid for such examination, are $3.00 for each 1000 linear feet which fee is imposed upon each film examined, regardless of duplication of films of the same picture, with a criminal penalty by way of fine for each violation of such laws.

Appellant, R. K. O. Pictures, Inc., is a corporation of the State of Delaware, engaged in producing and distributing motion pictures for exhibition in Ohio and elsewhere; appellant, Independent Treatre Owners of Ohio is a non-profit corporation of said state, owned and operated by numerous theatre owners of Ohio, organized to protect their interests in the motion picture industry; and the other two appellants are members of the Ohio corporation, who own and operate theatres for the exhibition of such motion pictures, and are residents and taxpayers of Ohio.

Plaintiffs make the following attack upon the Censorship Laws of Ohio:

(1) This state has no power to authorize censorship, and, therefore, cannot levy or collect fees for such censorship;

(2) Such fees are a tax upon free speech and free press, and are invalid as a prior restraint thereof;

(3) To require such a tax is a denial of equal protection and due process of law;

(4) The United States Supreme Court has declared censorship laws completely unconstitutional.

Plaintiffs do not confine their complaint to the effect of censorship on the showing of any particular film, nor to the validity of any particular part of such laws; but boldly challenge the constitutionality of the entire structure of the censorship laws, lock, stock and barrel.

In other words, plaintiffs now advance the argument that the sovereign state of Ohio has been relegated to the helpless state of being limited in its authority solely to the remedy of criminal prosecution after the fact for any abuse of the privileges of free speech and free publication, regardless of the potential evil of any particular motion picture They assert their legal right with impunity to exhibit publicly

any motion picture even though it be known or even admitted that such exhibition will be harmful to the public welfare.

Can the plaintiffs in good conscience, so insist on their legal right regardless of the public interest?

"A Court of Equity sits as a court of conscience and will never grant an injunction when it is unconscionable to do so, even though the plaintiff may show a legal right that is about to be violated." * * *

"A mere legal right in the plaintiff will not move the chancellor."

**Parsons v. Ohio Pail Co., 6 C. C. (N. S.) 116, 120,** affirmed **74 Oh St 464,** without opinion; Beach on Modern Equity; Powers appeal, 126 Penn., 175.

"A party appealing to a Court of Equity must make a case which can commend itself to the conscience of the court."

**Kellog v. Ely, 15 Oh St 64, 66; Snyder v. City of Alliance, 41 Oh Ap 48, 52.**

"An application for an injunction is addressed to the sound discretion of the judge who allows it,"

and is not a matter of absolute legal right. **Burnett v. Corp. of Cincinnati, 3 Ohio 73, 88; McCord et al v. Iker, 12 Ohio 387.**

Plaintiffs accuse the defendant of a desire to exercise totalitarian power even though the censorship laws have clearly been held invalid by the United States Supreme Court. as the defendant still insists on infringement of the civil and property rights of the plaintiffs and others similarly situated.

Such an accusation is not only unfounded but is clearly refuted by Exhibit D of the stipulation of facts herein which discloses that the defendant sought the advice of the Attorney General of Ohio as to the procedure to be followed by the Division of Film Censorship in reviewing motion pictures in the light of the recent decisions of the Supreme Court of the United States. Such a request not only fails to show a desire to cling to any arbitrary or unauthorized power to infringe on the legal rights of interested parties, but clearly indicates a desire on the part of the defendant merely to carry out the legal duties of the Division of Film Censorship.

The Director of the Department of Education. Hon. Clyde Hissong, as Superintendent of the Division of Film Censorship, is to be commended, under the circumstances. in seeking the advice of the Attorney General; and the distinguished Attorney General, Hon. C. William O'Neill, accepted his responsibility in a magnificient manner, by rendering a painstaking and exhaustive opinion on the difficult subject at hand.

The conclusions reached by the Attorney General surely invited a vast amount of labor for his office, as evidenced by the instant case, when he might easily have shirked his duty to

498

the citizens of Ohio, by merely taking the position that the censorship law in Ohio was a dead pigeon.

The State of Ohio need not apologize for the conduct of either of these state officials in the matter at issue in the instant case.

While accusing the defendant of grasping for unwarranted power, it might well be noted that the plaintiffs' absolute demand of the right to publicly exhibit any and all films, without prior restraint, regardless of their effect on the public welfare, does not carry the same inspiration as the magic peal of Patrick Henry's eloquence—"Give me Liberty or give me Death."

It was said in the Burstyn case, 343 U. S. 495:

"(b) That the production, distribution and exhibition of motion pictures is a large scale business conducted for private profit does not prevent motion pictures from being a form of expression whose liberty is safeguarded by the First Amendment."

Even under this sound statement of the law, an offensive commercial exploitation of the great freedoms guaranteed by the supreme law of the land, will not excite the conscience of a Court of Equity, like the inspiring words of Patrick Henry when he spoke for all mankind.

The mere invasion of a private right does not stir the conscience of a Court of Equity. Burns v. Cols. Citizen Tel. Co. et al., 10 C. C. (N. S.) 307; Domscke v. Railway, 148 N. Y. 337.

"We are asked to decide this case by choosing between two mutually exclusive alternatives: that motion pictures may be subjected to unrestricted censorship, or that they must be allowed to be shown under any circumstances. But only the tyranny of absolutes would rely on such alternatives to meet the problems generated by the need to accommodate the diverse interests affected by the motion pictures in compact modern communities."

Justice Frankfurter concurring opinion in the Burstyn case. supra.

This "tyranny of absolutes" is the position advanced by the plaintiffs in asserting their unbridled legal right to publicly exhibit any and all pictures, despite any evil effect they may generate on public decency and morals, subject only to subsequent punishment for a past offense by way of a nominal fine, after the venal purveyors of certain obscene films have reaped a rich pecuniary harvest of dollars. To limit the remedy of a sovereign state to such a type of punishment under such circumstances, would be an insult to the intelligence of the good mothers and fathers of America.

Such unbridled "tyranny of absolutes" smacks of license rather than liberty.

Liberty is not license. This history of mankind is written around the word "liberty." To its sacred cause the master minds of ages have dedicated the loftiest gems of oratory, and in its service men have reached the summit of human greatness.

License is a mould that tarnishes the splendor of the loftiest manhood and breeds indecency, immorality, suffering and hatred.

It is the function of government to protect and preserve the liberty of our nation as well as our individual liberties, safeguarded by the Bill of Rights in our federal and state constitutions; and this requires that license or abuse of those rights be regulated and prevented in extreme cases.

Plaintiffs boldly challenge the constitutionality of the entire structure of the censorship act of Ohio, on the premise that the State of Ohio has no power to authorize censorship of motion picture films; and, therefore, cannot levy or collect fees for such censorship, as such fees constitute a tax upon free speech and free press, and are invalid as a prior restraint thereof. They assert that the United States Supreme Court has declared all such censorship laws unconstitutional and void.

Chief reliance in support of plaintiffs' position is placed upon the recent pronouncement of the Supreme Court of the United States in the case of Burstyn, Inc., v. Wilson, Commr., 343 U. S. 495, decided May 26, 1952, which reversed the judgment of the Court of Appeals of New York (303 N. Y. 242); but the fact remains that the Ohio Censorship law was expressly approved as a constitutional enactment, by the United States Supreme Court in the case of Mutual Film Corp., v. Industrial Commission, 236 U. S. 230 (1915), a case similar in most respects to the instant case, in that an injunction was sought to restrain the enforcement of the censorship act of Ohio, on the ground that such law was completely unconstitutional.

Shortly after the decision in the Burstyn case, supra. the Supreme Court of Ohio, in the case of **Superior Films, Inc. v. Department of Education, etc., 159 Oh St 315, (1953)**, expressly ruled the Ohio Censorship Act was constitutional, notwithstanding the decision in the Burstyn case.

In the case of Mutual Film Corp. a distributor of motion picture films filed suit in the District Court of the United States, to enjoin the enforcement of the moving picture censorship Act of Ohio, enacted in 1913 (103 Ohio Laws, 399), which required the prior approval of a board of censors

before any motion picture could be publicly exhibited in the state, and directed the board to approve only such films as it adjudged to be "of a moral, educational or amusing and harmless character," the same as still provided in the present law contained in §3305.04 R. C. The statute was assailed as an unconstitutional abridgment of the freedom of the press guaranteed by the First and Fourteenth Amendments to the Constitution of the United States. The District Court rejected this contention. (215 F. Rep. 138.)

On appeal to the United States Supreme Court, that court affirmed the decree of the District Court, denied injunctive relief, and expressly ruled as follows:

"The judicial sense, supporting the common sense of this country, sustains the exercise of the police power of regulation of moving picture exhibitions.

"The exhibition of moving pictures is a business, pure and simple, originated and conducted for profit like other spectacles, and not to be regarded as a part of the press of the country or as organs of public opinion within the meaning of freedom of speech and publication guaranteed by the constitution of Ohio. * * *

"The moving picture censorship act of Ohio of 1913 is not in violation of the Federal Constitution or the Constitution of the State of Ohio, either as depriving the owners of moving pictures of their property without due process of law or as * * * abridging freedom and liberty of speech and opinion * * *."

In a series of decisions beginning with Gitlow v. New York, 268 U. S. 652 (1925), the United States Supreme Court held that the liberty of speech and the press which the First Amendment guarantees against abridgment by the Federal government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action. Since this series of decisions came after the Mutual decision, the Burstyn case, as Justice Clark says on p. 501, in delivering the opinion of the Court in that case, was the first case to present squarely to the Supreme Court of the United States, "the question whether motion pictures are within the ambit of protection which the First Amendment, through the Fourteenth, secures to any form of 'speech' or 'the press.'"

The United States Supreme Court in the Burstyn Case held among other things as follows:

"1. Expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." * * *

"2. Under the First and Fourteenth Amendments, a state may not place a prior restraint on the showing of a motion

picture film on the basis of a Censor's conclusion that it is 'sacrilegious.' " * * *

"(d) To the extent that language in the opinion in the Mutual Film Corp. v. Industrial Comm'n, 236 U. S. 230, is out of harmony with the views here set forth, it is no longer adhered to."

The Burstyn case thus overruled the first principle of the Mutual Film Case, and motion picture films became entitled to the protection of the free speech and free press guaranty of the First and Fourteenth Amendments.

The basic principles of freedom of speech and the press, like the First Amendment's command, do not vary. Those principles, make freedom of expression the rule.

It was stated in Near v. Minnesota ex rel. Olson, 283 U. S. 697, that "the protection even as to prior restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases." Id., at 716. In the light of the First Amendment's history and of the **Near decision,** the State has a heavy burden to demonstrate that the limitation when challenged presents such an exceptional case. Burstyn case, p. 503.

In the instant case the challenge is not limited to the exceptional case, but is directed against the entire Censorship Act.

Shortly after the Burstyn decision, Superior Films, Inc., commenced an action in the Supreme Court of Ohio **(159 Oh St 315),** seeking to have that court vacate the defendant's order rejecting the motion picture entitled "M" on account of being harmful, due to its depiction of certain crimes. The Supreme Court of Ohio took the view that notwithstanding the Burstyn case, p. 328, "the United States Supreme Court had not **ipso facto** taken away all community control of moving pictures by censorship, and the Ohio Supreme Court would not do so under the claim of complete unconstitutionality of censorship laws"; and thereupon denied the Writ of Mandamus prayed for, and expressly held as follows:

"1. Although expression by means of motion pictures is included within the freedom of speech and the press guaranty of the First Amendment to the federal Constitution, it does not follow that such Constitution guarantees absolute freedom to exhibit motion pictures of every kind at all times and in all places.

"2. Legislative power is not delegated, and the guaranty of freedom of speech and the press of the First Amendment to the federal Constitution and **Section 11, Article I of the Constitution of Ohio,** is not violated, by §§154-47 to 154-47i, inclusive, **GC,** creating a board of censors which is required to

examine and censor prior to exhibition motion picture films intended to be publicly exhibited and displayed in the state, and to pass and approve only such films as are, in its judgment, of a moral, educational or amusing and harmless character.

"3. The statutory criterion, for the examination and approval by the Division of Film Censorship of moving picture films for public exhibition in the state, that such films shall be of a 'moral, educational or amusing and harmless character,' is sufficiently clear, definite and comprehensive.

"4. The fees required by statute for the inspection and censorship of moving picture films to be publicly exhibited within the state, even though such fees exceed to some extent the necessary cost for making the inspection, constitute license fees and not a tax and are, therefore, not discriminatory or unlawful."

Superior Films, Inc., appealed to the United States Supreme Court which court on January 18, 1954, held in a per curiam opinion in full as follows:

"The judgments are reversed. Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 72 S. Ct. 777, 96 L. Ed. 1098."

See Superior Films, Inc. v. Department of Education, etc., 74 S. Ct. 286.

In the same per curiam opinion, the United State Supreme Court also reversed the judgment of the Court of Appeals of New York (305 N. Y. 336), which had sustained an order rejecting the motion picture film "La Ronde" on the ground that it was "immoral."

Thus, there has been only scanty, if any, elaboration of the Burstyn decision.

Upon the Burstyn decision and the per curiam reversal of the judgment in the Superior Films case, and the New York judgment, plaintiffs rest their claim that the Supreme Court has ruled that the censorship laws are totally unconstitutional and void. The record and decisions do not warrant such a conclusion.

This Court cannot accede to the proposition of law that an express decision of the Supreme Court of Ohio can be overruled by implication. If the United States Supreme Court desires to overrule a decision of the Supreme Court of Ohio, a sovereign state, let it so declare in express terms such intention.

Nearly forty years ago, in the case of Mutual Films the United States Supreme Court held "the general terms of censorship, while furnishing no exact standard of requirements, may get precision from the sense and experience of

men and become certain and useful guides in reasoning and conduct."

That aspect of the Mutual Films decision certainly was not overruled or even questioned by the Burstyn decision.

In the Superior Films case, supra, Hart, J., speaking for the Supreme Court of Ohio, says on p. 332:

"The criteria and standards of the Ohio Statute have had the attention of the United States Supreme Court wherein their definiteness has been recognized. In the Mutual Films case the court held that the criteria of the statute did leave decision to arbitrary judgment, but were deemed to have acquired precision from the judgment and experience of administrators. It is to be observed that the holding of the court on this branch in the Mutual case was not overruled or criticised in the Burstyn case."

Again, on the same page Hart, J., says:

"Furthermore, the tests of the censorship statute have over a period of over 40 years acquired a definite and circumscribed meaning. As stated in defendant's brief,

" 'The standards have enjoined the obscene, the immoral, and that which tended to promote crime or riot, judged in relation to the impact and the audience.' "

In the Burstyn case Justice Clark speaking for the Supreme Court of our nation, on p. 506 says:

"We hold only that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is 'sacrilegious.' "

Since the term "sacrilegious" was the sole standard under attack in the Burstyn case that part of its decision did not directly affect the censorship act of Ohio. since that was not one of the charts or standards of the Ohio censorship law under either its express terms or the limited interpretation placed upon its by the Supreme Court of Ohio.

In the Superior Films case, it should be noted that only the judgment itself was reversed, not the opinion or syllabi of the Ohio Supreme Court, and such reversal was based on a mere citation of the Burstyn case, with no explanation as to the extent or effect thereof. The same situation prevailed as to the reversal of the Court of Appeals of New York.

"This court will not anticipate the decision of the state court as to the application of a police statute of the state to a state of facts not involved in the records of the case before it." Mutual Films case, supra.

"It will not be assumed, as a basis for attack under the Fourteenth Amendment or the state constitution. that one who has not applied for it will be refused a certificate. or that the Board will deny any right to which he is entitled." Bourgois

Inc. v. Chapman, et al., 301 U. S. 183; Yakus v. United States, 321 U. S. 414, 416; Smith v. Duedner, 175 F. Rep. (2nd) 629.

"Assuming that a state may establish a system for the licensing of motion pictures, an issue not foreclosed by the Court's opinion, our duty requires us to examine the facts of the refusal of a license in each case to determine whether the principles of the First Amendment have been honored." Justice Reed, p. 506, concurring opinion in the judgment of the court in the Burstyn case.

If Justice Reed's opinion constitutes a sound statement of the law, then by what course of reasoning is this Court required to extend the effect of a decision of the United States Supreme Court beyond what that court itself declines to declare the extent and effect of its own decision.

The Burstyn case in effect recognizes the right of a state to establish a constitutional system for licensing motion picture films, since it saw fit to rule on sufficiency of the particular standard of "sacrilegious" involved in that case. It would hardly become the highest court in the land to lend itself to a lengthy discourse on the sufficiency of the standards or tests contained in a censorship law if any and all censorship systems were beyond the power of the state to create and maintain.

In the Superior Films case the sole standard under attack was "tends to promote crime" as applied to the particular motion picture film "M." On appeal it is apparent that the mere citing of the Burstyn case as the basis for reversal, necessarily limits such reversal to the insufficiency of the particular standard in question.

The reversal of the New York Court of Appeals in the Commercial Pictures case on a mere citation of the Burstyn case would lead to the same consequences, since the only standard involved was the term "immoral" as applied to the picture film "La Ronde." Such reversal must be limited to a finding that the particular standard in question was constitutionally insufficient.

Whether the reversal in the Superior Films case still permits censorship on the standard that the film in question "incites to crime or riot," raises a grave question which the Supreme Court of the United States must make an express declaration on, before the State of Ohio is forced to abandon such a regulation.

The reversal of the New York case of Commercial Pictures on the basis that the standard "immorality" was insufficient, and, therefore, invalid, presents the same grave responsibility to the United States Supreme Court of making an express

declaration as to whether its recent decisions license such films regardless of the immorality depicted and the evil effect thereof on the public welfare.

It is the opinion of this Court that the Supreme Court of the United States will never countenance any such express declaration as the law of the land; and we rebel from the thought that the sovereign state of Ohio should ever be denied the right to protect the decency and morals of its people from the impact of any offending motion picture film, regardless of the gross immorality depicted and its effect on the public welfare. We cannot regard this as beyond the power of government.

As so well stated by Justice McKenna in the Mutual Film case on p. 242:

"Besides there are some things which should not have pictorial representation in public places and to all audiences. And not only the State of Ohio but other states have considered it to be in the interest of the public morals and welfare to supervise moving picture exhibitions. We would have to shut our eyes to the facts of the world to regard the precaution unreasonable or the legislation to effect it a mere wanton interference with personal liberty."

It has never been denied that the police power of a sovereign state constitutes a legitimate qualification of freedom of speech and press. Certainly this constitutional guaranty does not deprive the state of its power to enact laws for the protection of the public health, morals, safety, and welfare. 8 O. Jur. 468, Sec. 342.

It is the generally accepted law that the state has power to deal by its municipal law with matters deemed offensive to public morals. Commercial Pictures Case, supra, p. 561.

"There can be no inherent right to publicity which tends to destroy the very social fabric of the community and consequently in such instances there is no right of free speech or free press to be infringed." Hart, J., speaking for the Supreme Court of Ohio, p. 327, Superior Films case.

In the Burstyn case, Frankfurter, J., in a concurring opinion on p. 518 says:

"It would startle Madison and Jefferson and George Mason, could they adjust themselves to our day, to be told that the freedom of speech which they espoused in the Bill of Rights authorizes a showing of 'The Miracle' from windows facing St. Patrick's Cathedral in the forenoon of Easter Sunday."

That such offensive exploitation of modern means of publicity is not a fanciful hypothesis, see N. Y. Times, April 14, 1952, p. 1, Col. 4.

This observation of Mr. Justice Frankfurter tends toward an admission that under recent federal interpretations of the constitutional guaranty of freedom of speech and press, we have not only broken loose from the moorings of those illustrious men who placed the Bill of Rights in the Constitution of the United States, but we have been set adrift upon the boundless sea amid a myriad of selfish commercial exploiters whose sole incentive is pecuniary gain on a vast scale with utter disdain for the public interest.

In view of the comments of Mr. Justice Frankfurter and the offensive exploitation of such modern means of public expression, as actually took place, it might not be amiss to observe that a goodly portion of the devout mothers and fathers of America yearn for a return to the simple faith of our fathers; and it would be a heartening step, indeed, if the Supreme Court of our land should develop a tendency toward the restoration of the power of the state and local governments to manage their own affairs in the public interest.

While the recent decisions of the Supreme Court of the United States have created grave concern and doubt as to the limitations and force of our censorship law on motion picture films, there is one standard in the Ohio law, "obscene" which is recognized by the Supreme Court of Ohio as a valid and constitutional standard and test on which to base censorship of such films. In fact it would appear that the United States Supreme Court itself, still recognizes the right of the state to regulate and censor motion pictures under a statute designed to prevent the showing of obscene films.

Even in the Burstyn case, Justic Clark in delivering the opinion of the United States Supreme Court on p. 505 says:

"* * *, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films. That is a very different question from the one now before us."

In the Near case, supra, the United States Supreme Court stated that "the primary requirement of decency may be enforced against obscene publications." 283 U. S. 697, 716.

In Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572 (1942), Mr. Justice Murphy stated for a unanimous Court:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."

While the chief reliance in support of plaintiffs' position necessarily is based upon the pronouncement of the Supreme Court of the United States in the Burstyn case, there are many phases of that decision that indicate recognition of a limited field where censorship may still be applied under both our federal and state constitutions, regardless of the constitutional guaranty of freedom of speech and the press.

Mr. Justice Clark in delivering the opinion of the Court in the Burstyn case itself on page 502, says:

"It is further urged that motion pictures possess a greater capacity for evil particularly among the youth of a community, than other modes of expression. * * * **If there be capacity for evil it may be relevant in determining the permissible scope of community control but it does not authorize substantially unbridled censorship such as we have here.**" * * * (Emphasis ours.)

Mr. Justice Clark continues:

"To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. **It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places.** That much is evident from the series of decisions by this Court with respect to other media of communication of ideas." (Emphasis ours.)

Mr. Justice Clark on p. 506 refers to the possibility of a valid statute designed to prevent the showing of obscene films as heretofore recited; and Mr. Justice Reed says the court's opinion in the Burstyn case does not foreclose the issue that a state may establish a system of censorship of motion pictures; but that the duty of the court is to examine the facts in each case to determine whether the principles of the First Amendment have been honored. p. 506.

Even Mr. Justice Frankfurter in the same case condemns the "tyranny of absolutes" in the court being asked to choose between two mutually exclusive alternatives: motion pictures are subject to unrestricted censorship, or no censorship at all. p. 517.

From these expressions of the United States Supreme Court, the Supreme Court of Ohio, and otherwise, we conclude, that, although liberty of expression by means of motion pictures is included within the freedom of speech and the press guaranty of the First and Fourteenth Amendments of the Constitution of the United States, as well as **Section 11, Article I of the Constitution of Ohio,** there still remains a limited field in which decency and morals may be protected from the

impact of an offending motion picture film by prior restraint under proper criteria and standards; and, to our mind, the United States Supreme Court has not **ipso facto** taken away all community control of moving picture films by censorship, and this Court will not do so under the claim of complete unconstitutionality of censorship laws.

We are convinced the judicial sense, supporting the common sense of this country, still sustains the exercise of the police power of a sovereign state of regulation of motion picture exhibitions in public.

We further find that the statutory criteria and standards for censorship and approval of such films for public exhibition in this state (§3305.04 **R. C.**), that such films shall be, "of a moral, educational, or amusing and harmless character," under the limited and circumscribed meaning thereof as interpreted by the Supreme Court of Ohio, is sufficiently clear, definite and comprehensive, to prevent the showing of films found to be obscene, by the Division of Censorship of Ohio.

There may be further authority under the statutes to reject films which actually incite crime, or which depict extreme immorality, clearly harmful to the public interest, but under the issues raised in this case, it is unnecessary for this Court to determine the right of censorship by the State of Ohio, as to such films.

The plaintiffs further assert that the charges levied and collected by the State of Ohio are an unconstitutional tax upon freedom of speech and press.

The Supreme Court of Ohio passed upon the validity of the fees required under the censorship laws of Ohio, in the Superior Films Case, in which it held as follows:

"4. The fees required by statute for the inspection and censorship of moving picture films to be publicly exhibited within the state, even though such fees exceed to some extent the necessary cost for making the inspection, constitute license fees and not a tax and are, therefore, not discriminatory or unlawful."

This part of the decision in Superior Films, was not affected by the reversal of the judgment by the United States Supreme Court. The recent amendment of the statute as to appropriation of any surplus fees collected does not affect the principles of law at issue in the instant case; and in view of this Court's conclusion as to the constitutionality of the censorship law, it is not necessary to pursue further this question of fees collected.

The plaintiffs raise the further question of the invalidity of the fees collected as a denial of equal protection of the Law and Due Process.

The fees in question were held not to be discriminatory or unlawful by the Ohio Supreme Court in the Superior Film case and in the Mutual Film case, the United States Supreme Court held the Ohio Censorship law did not violate Due Process requirements of the federal and state constitutions.

The Superior Films reversal did not affect these prior holdings of the federal and state Supreme Courts.

Furthermore, as to a denial of Equal Protection of the Law, Mr. Justice Clark in delivering the opinion of the Supreme Court of the United States in the Burstyn case, p. 503, says:

"Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems."

This Court, therefore, denies plaintiffs' prayer for an injunction restraining the further collecting of the fees authorized under the censorship laws; and dismisses the petition herein at plaintiffs' costs.

Entry may be drawn accordingly with exceptions by counsel for plaintiffs.